IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 20, 2003 Session

## MARCIA DIANE McALEXANDER v. ALBERT WESLEY McALEXANDER

**A Direct Appeal from the Circuit Court for Shelby County**
**No. 149228-4    The Honorable Rita L. Stotts, Judge**

---

**No. W2001-02550-COA-R3-CV  - Filed September 15, 2003**

---

This appeal involves two consolidated cases.  The first case is a post-divorce proceeding initiated by Wife as a Rule 60 motion and petition for contempt to modify and enforce the final decree of divorce as it pertains to the alimony award and division of marital property.  In these proceedings, the parties consented to arbitration of all determinative issues, and the award of the arbitrator was confirmed by the trial court.  Husband appeals.  We affirm as modified.  The second case is an appeal of the order of the trial court granting a summary judgment from Husband's petition seeking a sale for partition of the parties' former marital home, now held by the parties as tenants by the entirety and with possession awarded to Wife until she remarries.  The trial court granted summary judgment decreeing a sale for partition.  Wife appeals.  We affirm, as modified, for a determination on remand of Wife's interest in the property by virtue of the award of possessory rights awarded in the final decree.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court:  Post-Divorce Proceeding Affirmed as Modified; Sale for Partition Affirmed and Remanded for Further Proceedings**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY M. KIRBY, J., joined.

William E. Miller, Cordova; Robert Wampler, Memphis, For Albert Wesley McAlexander

Stevan L. Black, John C. Ryland, Vickie Hardy Jones, For Marcia Diane McAlexander

**OPINION**

POST- DIVORCE PROCEEDING

This is a divorce case. Marcia Diane McAlexander ("Wife," "Plaintiff," or "Appellant") and Albert Wesley McAlexander ("Husband," "Defendant," or "Appellee") were married on June 25, 1971. The parties have one child who, at the time of this case, had reached the age of majority. Husband is the owner of Al's Cycle Shop, Inc. ("ACS"), a Tennessee Corporation[1] and Al's SeaDoo Too, a wholly owned subsidiary of ACS. During the marriage, both Husband and Wife were employed by ACS.

On or about April 15, 1995, the parties separated. Wife filed her Complaint for Absolute Divorce and Injunctive Relief against Husband on June 7, 1995. The Complaint reads, in relevant part, as follows:

> 4. Plaintiff alleges that there are irreconcilable differences between her and Defendant.
>
> 5. Plaintiff alleges that Defendant is guilty of inappropriate marital conduct.
>
> 6. Plaintiff alleges that on or about April 27, 1995, Defendant sexually assaulted Plaintiff after Defendant arrived home from a concert intoxicated. Plaintiff further alleges that on or about Sunday, June 3, 1995, at 2:00 a.m., Defendant came to the parties' lake house at Pickwick Lake intoxicated and began breaking items in the residence and further threatened to harm Plaintiff. Plaintiff alleges that as a result of these incidents Plaintiff reasonably fears that unless this Honorable Court issues an injunction enjoining Defendant from coming about, harassing, striking, threatening, or harming Plaintiff in any way, irreparable injury will occur.
>
> 7. Plaintiff further alleges that she and Defendant no longer reside in the same household, and this Honorable Court should enjoin Defendant from coming around Plaintiff's residence at 4511 Barfield Road, Memphis, Tennessee.
>
> WHEREFORE, PREMISES CONSIDERED, Plaintiff prays:
>
> \*                               \*                               \*
>
> b. That Plaintiff be awarded an absolute divorce from Defendant.

---

[1] ACS is a family business, started by Husband's father. Following the death of Husband's father in 1983, Husband's mother became the owner of ACS. Husband's mother died in 1997.

c. That Plaintiff be awarded alimony, attorney fees, and suit expenses both pendente lite and permanent.

d. That there be a reasonable and equitable division of the property of the parties pursuant to T.C.A. § 36-4-121.

e. That any marital dissolution agreement entered into between the parties be approved by the Court and incorporated into the final decree of divorce.

f. That this Honorable Court issue an injunction enjoining Defendant from coming about, harassing, striking, threatening, or harming Plaintiff in any way.

Husband filed his Answer and Counter-Complaint on July 28, 1995, denying the material allegations and seeking divorce on the grounds of irreconcilable differences. The parties entered into a Marital Dissolution Agreement ("MDA") on August 19, 1995. This MDA was drafted by Husband's attorney and reads, in pertinent part, as follows:

## I. MARITAL PROPERTY

1. The parties own as Tenants by the Entirety their home at 4511 Barfield Road, Memphis, Shelby County, Tennessee. The parties will continue to own the home as Tenants in Common after their divorce. Wife will have the right to live in the home until her remarriage from the date of this Agreement. Upon Wife's remarriage from the date of this Agreement, whichever occurs first, the home will be sold and the net proceeds divided equally between the parties. All furniture, furnishings and personal effects in the home will remain in the home. These items will be divided equally between the parties when the home is sold. Husband will have the right to live in the Barfield home from time to time, but will give reasonable notice to Wife before coming home.

2. The parties own a home in Tishominga County, Mississippi on Pickwick Lake. Husband will have the right to reside in the home at Pickwick Lake. The parties will continue to own the property as Tenants in Common following their divorce. In the event that the parties ever determine to sell the home at Pickwick Lake, the parties will equally divide the net proceeds from the sale of same. Both parties will have the right to reside in the Pickwick property for as long as they own such property.

3. Until the home at 4511 Barfield and the home at Pickwick are sold by the parties, the Husband will pay all mortgage payments, insurance, taxes, maintenance and repairs.

4. Wife will continue to be the sole beneficiary of Husband's insurance policies currently in effect.

5. The parties will equally divide the balance of their marital assets in equal shares including Husband's stockholder interest in Al's Cycle Shop, Inc. Wife will continue to work in a management position at Al's Cycle Shop, Inc. and Al's Sea Doo Too and will receive whatever compensation she has previously been receiving from such business. Wife will continue to receive her year-end bonus from the businesses as long as she maintains her management-level position at Al's Cycle Shop, Inc. and Al's Sea Doo Too.

6. Husband will make all monthly lease payments on Wife's 1992 Acura automobile until the conclusion of the lease payments. In the event that the Wife elects to purchase the car out of lease at the conclusion of the lease period, then the parties will equally pay for the buy-out of such automobile.

7. Husband will continue to be responsible for the parties' son's college tuition as long as the son is in college and making passing grades.

## II. ALIMONY

8. Neither party will pay any alimony, either periodic or lump sum to the other party.

## III. ATTORNEY FEES AND COURT COSTS

9. Husband will pay all Court costs that may be incurred as a result of this divorce action and will pay his attorney, Blanchard E. Tual.

10. Each party acknowledges that this Agreement is fair and equitable to each party. This Agreement is executed voluntarily by the parties under no threat or duress, economic or otherwise.

## IV. MISCELLANEOUS

11.    In the event that the parties remarry following this divorce, then this Agreement shall be null and void and the parties will take the steps necessary to put the real properties mentioned in this Agreement back into Tenancy by the Entirety rather than Tenants in Common.

12.    This Agreement is not intended to be, nor shall it be construed to be an agreement for divorce.  However, this Agreement is effective and enforceful as a determination of the property rights of the parties.

13.    The parties acknowledge that they have had the benefit of legal counsel and representation and that the Husband has been represented by Blanchard E. Tual, attorney.  The Wife has previously been represented by Mitchell D. Moskovitz.

14.    In the event that it should be determined either by this Court or by any other court of competent jurisdiction that either party has breached any provision of this Agreement, then the offending party will pay to the other party reasonable attorney fees and costs incurred in the enforcement of any provision of this Agreement.

15.    The failure of either party to insist upon the strict performance of any provision of this Agreement will not be construed as a waiver of any subsequent default of the same or similar nature.

16.    This Agreement will be binding upon and inure to the benefit of the parties and their respective heirs, personal representatives, and assigns.

\*                                        \*                            \*

19.    This Agreement will be construed and governed in accordance with the laws of the State of Tennessee.

20.    This instrument contains the entire understanding and agreement between the parties and no modification of this Agreement will be effective unless in writing and executed by both parties.[2]

The Final Decree of Divorce was entered on August 23, 1995 and reads, in relevant part, as follows:

---

[2] This MDA was incorporated by reference into the Final Divorce Decree, entered August 23, 1995, see *infra*.

-5-

THIS CAUSE came on to be heard this day upon the Complaint of the Plaintiff, MARSHA DIANE MCALEXANDER, the Answer filed by the Defendant, ALBERT WESLEY MCALEXANDER, the Counter-Complaint filed by the Counter-Plaintiff, Albert Wesley McAlexander, and the Answer filed by the Counter-Defendant, Marsha Diane McAlexander, upon the written Marital Dissolution Agreement filed in this cause on August 10, 1995, testimony of the Counter-Plaintiff, Albert Wesley McAlexander in open Court, from Statement of Counsel for the Counter-Plaintiff, Blanchard E. Tual and from the entire record in the cause, from all of which it satisfactorily appears to the Court that Irreconcilable Differences have arisen between the parties and, on this basis, the marriage should be dissolved and the Counter-Plaintiff awarded a Final Decree of Divorce.

The Counter-Plaintiff, Albert Wesley McAlexander, has testified and the parties have acknowledged in the Marital Dissolution Agreement that the Agreement is fair, equitable and acceptable to each other and there being no proof or testimony to the contrary, the Court is of the opinion and affirmatively finds that said Marital Dissolution Agreement is fair and equitable to the parties and in their best interest. The Marital Dissolution Agreement is hereby approved and is expressly incorporated by reference in this Final Decree of Divorce.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED as follows:

1. The Counter-Plaintiff, Albert Wesley McAlexander is granted an absolute divorce from the Counter-Defendant, Marsha Diane McAlexander, upon the grounds of Irreconcilable Differences and the marriage of the parties is dissolved. Each of the parties is restored to the rights and privileges of unmarried persons.

2. The original Complaint of the Plaintiff, Marsha Diane McAlexander, against Albert Wesley McAlexander, the Defendant, is hereby dismissed.

3. The Marital Dissolution Agreement as entered into between the parties, is approved by the Court as being fair and equitable and in the best interest of both parties.

4. All the provisions of the Marital Dissolution Agreement will be binding upon the parties, their heirs, beneficiaries, successors and assigns.

On July 25, 1996, Ms. McAlexander filed a "Petition for Injunction Relief, for Scire Facias and Citation for Civil and Criminal Contempt, Combined with Motion for Relief from

Judgment Pursuant to Rule 60 of the Tennessee Rules of Civil Procedure, and for Attorneys' Fees" (the "Petition"). The Petition reads, in relevant part, as follows:

> 3. Immediately following the entry of the Final Decree of Divorce, Defendant began engaging in a course of conduct designed to harass and humiliate Plaintiff both at work and at home. Examples of his harassing behavior include, but are not limited to, the following:
>
> a. Defendant incessantly telephones Plaintiff at all hours of the day and night. On one occasion, he called her three times in seven minutes after 11:00 p.m.
> b. Defendant has made sexual advances towards Plaintiff at work and at home.
> c. Defendant devised a method by which he could listen to Plaintiff's cellular telephone and answering machine messages.
> d. Defendant frequently knew Plaintiff's whereabouts although she did not provide him with this information.
> e. Defendant threatens Plaintiff, calls her names, comes to her home uninvited and without notice, and causes her to fear for her safety.
> f. Defendant's actions in the workplace were calculated by Defendant to make Plaintiff's continued employment impossible.
>
> 4. Defendant's constant harassment caused Plaintiff to terminate her position with Al's Cycle Shop and Al's Sea Doo Too.
>
> 5. During their twenty-four year marriage, Plaintiff relied upon her income from employment at Al's Cycle Shop and Al's Sea Doo Too and upon support received from Defendant. Following the parties' divorce, Plaintiff relied upon the income she received from employment at Al's Cycle Shop and Al's Sea Doo Too to support herself. Defendant induced Plaintiff to enter into the Marital Dissolution Agreement and the waiver of alimony based upon the promise of continued employment at Al's Cycle Shop and Al's Sea Doo Too. Defendant then engaged in a course of conduct designed to drive Plaintiff away from the employment. Although Plaintiff has secured employment as a commissioned sales person, she is unable to earn as much money as she received at Al's Cycle Shop and Al's Sea Doo Too. Moreover, she is unable to support herself without Defendant's assistance. Plaintiff requests that this Court grant her relief from the Final Decree of Divorce pursuant to Rule 60 of the

Tennessee Rules of Civil Procedure insofar as it waives alimony and to award her alimony in an amount sufficient to meet her needs.

6. Despite the language in the parties' Marital Dissolution Agreement, Defendant has advised Plaintiff that she is not entitled to any part of his individual retirement account and that he is not going to divide assets with her.

7. Defendant is in willful contempt of this Court's order by failing to divide his stock in Al's Cycle Shop and Al's Sea Doo Too, his individual retirement account, and other assets equally with Plaintiff, as required in the parties' Marital Dissolution Agreement.

On July 30, 1996, Ms. McAlexander also petitioned the court for injunctive relief, restraining Mr. McAlexander from disposing of funds received on the sale of the Pickwick Lake property. The court issued a temporary injunction on July 30, 1996, enjoining Mr. McAlexander from disposing of any proceeds received on the sale of the Pickwick Lake property.

On or about February 12, 1997, Ms. McAlexander amended her Petition by adding the following relevant information:

C. At the time the parties signed the Marital Dissolution Agreement, Plaintiff did not desire a divorce and wanted to reconcile. Defendant desired a divorce but led Plaintiff to believe that reconciliation was a possibility. Material and substantial changes [in] circumstances have occurred since the parties entered into the Marital Dissolution Agreement. Specifically, among other changes, Defendant has engaged in a course of conduct calculated to harass Plaintiff. Since the parties' divorce, Plaintiff has resided exclusively at the home located at 4511 Barfield Road. Defendant has not lived in the home since the parties' divorce. Moreover, reconciliation is not a possibility.

\*                              \*                              \*

H. In the original Petition, Plaintiff requests an award of alimony based on her allegations that Defendant forced her to terminate her employment with Al's Cycle Shop by harassing behavior towards her. Plaintiff now amends the Petition to request that in the alternative, this Court award her damages for Defendant's breach of contract described below.

I. In the signed Marital Dissolution Agreement, the parties agreed that Plaintiff would continue to work at Al's Cycle Shop and that she would be paid at the same rate that she had been paid. Defendant, however, made continued employment impossible for Plaintiff because he harassed her at work. Specific examples of Defendant's harassing behavior are contained in the original Petition filed by Plaintiff and incorporated herein by reference.

J. Defendant's conduct constitutes a breach of contract for which Plaintiff is entitled to an award of compensatory damages.

K. After terminating her employment with Al's Cycle Shop, Plaintiff attempted to mitigate the damages by securing employment with Roadshow BMW. The new employment, however, provides a less desirable schedule for Plaintiff. Moreover, she is paid less money than that which she was paid at Al's Cycle Shop. Thus, Plaintiff will continue to sustain damages from Defendant's breach of contract.[3]

Husband filed a Response to Wife's Amended Petition on March 3, 1997. This Response reads, in relevant part, as follows:

c. Defendant denies this paragraph [paragraph I of Wife's Amended Petition] as stated. Specifically, at the time the parties signed the Marital Dissolution Agreement, both the Plaintiff and Defendant anticipated that they would reconcile. Both parties have stated, subsequent to the entry of the Final Decree of Divorce, that it was their intention that they would reconcile.

On this basis, the Defendant asserts that pursuant to Rule 60 of the Tennessee Rules of Civil Procedure that the Marital Dissolution Agreement entered into should be set aside as a result of mutual mistake and mutual misrepresentation.

\*                                    \*                                    \*

Plaintiff now seeks to have alimony awarded to her, although she waived that award with full knowledge that there was significant potential for problems working with her ex-husband at his business.

---

[3] Wife amended this Petition a second time on October 16, 1998. In the Second Amended Petition Wife asserted that Husband was in contempt of court for allowing his life insurance to lapse in violation of Paragraph 4 of the MDA.

> Plaintiff is not in need of alimony as she is employed in a full-time position with Roadshow BMW.

On or about June 12, 1997, Wife served upon the Custodian of Records of ACS a subpoena duces tecum requesting all financial information related to Husband's ownership in ACS.[4] In response to Wife's request, Husband filed a Motion for Protective Order with the court on June 24, 1997, asserting that such discovery was unduly burdensome and that no determination had been made by the Probate Court of Shelby County, concerning Husband's ownership of ACS since the death of his mother. In addition, on July 25, 1997, Husband filed an "Amended Motion for Relief from Judgment Pursuant to Rule 60 of the Tennessee Rules of Civil Procedure and request for Appointment of a Special Master" (the "Motion for Relief"). This motion explains the status of the ACS stock and asserts mistake as a basis for relief from the Final Decree of Divorce. Because the motion is untimely, we see no need to quote the provisions thereof.

On October 27, 1998, Wife filed a Response to Husband's Amended Motion for Relief, wherein she asserts that Husband is not entitled to relief under Tenn. R. Civ. P. 60 because he had failed to file his Motion for Relief within one-year of the Final Decree of Divorce. In the alternative, Wife asserts that Katie McAlexander had made a successful transfer of ten (10) shares of ACS stock to Husband.

A Consent Order Appointing Arbitrator was entered on January 20, 1999. Both parties submitted position statements to the Arbitrator, outlining the issues to be settled.[5] After a hearing on the matter, the Award of Arbitrator was filed on March 27, 2001. The Award of Arbitrator reads, in pertinent part, as follows:

> 2. The parties' Marital Dissolution Agreement did not provide for an award of alimony to Wife based on the fact that the parties' Marital Dissolution Agreement provided that following the parties' divorce Wife would continue to work in a management position at Al's Cycle Shop and Al's SeaDoo Too and would receive the level of compensation she had previously been receiving from said businesses.... At the hearing before the Arbitrator, Husband acknowledged he would have had an alimony obligation to Wife if she had not been employed at Al's Cycle Shop and Al's SeaDoo Too.

---

[4] This request was based upon the clause in the MDA, stating that the parties would divide stock in ACS and Wife's assertion that Husband's failure to do so constituted contempt.

[5] Although not raised on appeal, we note for purposes of clarification that this Court, having reviewed the position statements of the parties, the transcripts of the arbitration proceeding, and the subsequent Award of the Arbitrator, find that the Arbitrator did not exceed the scope of his review in this matter.

3. Prior to the date of the parties' divorce, Wife did not experience any problems with her employment at Husband's businesses from Husband or otherwise. Wife and her witnesses testified that immediately following entry of the parties' Final Decree of Divorce, Husband began engaging in a pattern of abusive and hostile conduct towards Wife at work. Husband admitted he threw a mobile phone to the floor at Wife's home; admitted calling Wife and her friends obscene names; admitted drinking to excess and leaving Wife's home in a cab. Much of the other hostile and abusive behavior to which Wife testified was not denied by Husband. Wife terminated her employment at Husband's businesses in January 1996.

4. The Arbitrator finds that at the time the parties entered into the Marital Dissolution Agreement, Husband was the manager and de facto owner of Wife's employers, ACS and SeaDoo. Husband had the ability to provide for Wife's continued employment in those businesses, and based upon this understanding of Wife's continued employment..., Wife waived her claim to alimony after the 24 year marriage. The Arbitrator finds that there was a failure of consideration for Wife's waiver of alimony, and that the Marital Dissolution Agreement should be modified to require that Husband pay Wife alimony in the manner set out herein.

5. The proof showed that Wife's income from Husband's businesses in 1994 was $29,770 and $50,045 in 1995. Wife's 1995 income included a bonus of $10,000. She admitted that she did not receive a bonus in 1994. Husband testified that bonuses were not paid after 1995. There was no proof of Wife's income from the businesses prior to 1994, since there is an uncertainty as to what Wife would have received from Husband's businesses had her employment not been terminated, the Arbitrator finds that for the purposes of this ruling her income would have been $43,286 per year. (The Arbitrator considered simply averaging the two years' employment, or taking her 1995 income and removing the bonus, or a weighted average of the income from the years.)

6. Therefore, the Husband's alimony obligation to Wife for the years 1996 through 2000 will be an amount equal to $43,286 per year less the amount of Wife's actual earnings for those years. The alimony will be calculated as follows:

| Year | Wife's actual income | Alimony Award |
| --- | --- | --- |

| | | |
|---|---|---|
| 1996 | $33,064 | $10,222 |
| 1997 | $27,126 | $16,160 |
| 1998 | $21,204 | $22,082 |
| 1999 | $20,680 | $22,606 |
| 2000 | (To be calculated after W-2 is received by Arbitrator) | |

\*                                              \*                                              \*

The alimony arrearage through 2000 will be calculated as set out above and the total amount will be paid from Husband to Wife in equal quarterly installments with no interest over a two year period with the first quarterly payment to be paid on April 1, 2001. In the event that Husband fails to pay any portion of this judgment strictly in accordance with this ruling, then the unpaid amount shall be immediately accelerated, and such unpaid amount shall bear interest at the rate of 10% per annum from January 1, 2001, until paid in full.

7. The alimony arrearage as set out above shall be deemed periodic alimony for federal income tax purposes. Had Wife received the payments in the form of salary from Husband's businesses, they would have been taxable to Wife. Therefore, the payments made by Husband to Wife herein shall be deductible by Husband for federal income tax purposes and taxable to Wife.

\*                                              \*                                              \*

9. The parties were married for 24 years. The Arbitrator has considered the criteria set out in T.C.A. 36-5-101, including the disparity of the income of the parties. Wife was born on August 22, 1949, and she was 46 years of age at the time of the divorce.... The Arbitrator finds that Wife is economically disadvantaged relative to Husband. However, the Arbitrator finds that Wife is capable of being rehabilitated as evidenced by her employment since her termination from Husband's businesses. Therefore, these payments from Husband to Wife shall be deemed to be rehabilitative alimony and shall automatically terminate upon the earliest to occur of Wife's death or remarriage, Husband's death, or September 1, 2005.

10. The Marital Dissolution Agreement signed by the parties stated the following:

"The parties will equally divide the balance of their marital assets in equal shares including Husband's stockholder interest in Al's Cycle Shop, Inc."

The Arbitrator finds that at the time of the signing of such Agreement, Husband owned 10 shares of stock in Al's Cycle Shop, Inc., and that there were a total of 40 shares of stock outstanding at the time in the Company. Therefore, Husband owned a 25% interest in said Company at that time. In order to carry out the terms of their Agreement, Husband is hereby ordered to transfer to Wife one-half (½) of his shares in said Company. After such transfer, Wife will own 12.5% of the outstanding stock in said Company. In addition, Husband shall transfer to Wife one-half of the 74 shares he owned in Union Planters Corporation.

\*                          \*                          \*

15. Paragraph 14 of the parties' Marital Dissolution Agreement provides that in the event it should be determined that either party breached a provision of the Agreement, the breaching party shall pay the non-breaching party's reasonable attorneys' fees and costs incurred in the enforcement of the parties' Agreement. The Arbitrator finds that because of the disparity in the parties' relative abilities to pay fees and because of the relief requested and obtained by Wife herein, including the enforcement of provisions of the parties' Marital Dissolution Agreement, Wife is entitled to an award of attorneys' fees from Husband in the amount of $25,000.... Wife shall be responsible for the payment of all of her remaining attorney fees and expenses.

On March 26, 2001, Husband filed an Application for Modification of Award of Arbitrator. Husband's Application claimed, *inter alia*, that the Arbitrator erred in modifying the Final Decree of Divorce by granting Wife alimony without any hearing or evidence as to the criteria outlined in T.C.A. § 35-5-101(d)(1). Furthermore, Husband asserted that the Arbitrator miscalculated the amount due Wife. Wife filed a response to Husband's Application for Modification on May 3, 2001 in which she asserted that the Arbitrator's award should stand.

The trial court heard Husband's Application for Modification of the Award of Arbitrator on May 18, 2001. By Order dated May 25, 2001, the trial court referred Husband's Application to the Arbitrator for his ruling. The Arbitrator subsequently denied Husband's Application for Modification by Order entered June 6, 2001. In his Order, the Arbitrator stated that he "did consider all of the criteria contained in [T.C.A. § 36-5-101(d)(1)] in making the award [of alimony to Wife]." On June 6, 2001, Wife filed a Motion for Confirmation of Arbitrator's Award. On June 14, 2001, Husband filed his Motion for Rejection of Arbitrator's Award. An

Order Confirming Award of Arbitrator and an Order of Judgment, incorporating the Award of Arbitrator, were entered by the trial court on August 13, 2001.[6]

Husband appeals from the Order of Judgment and raises the following issues for review, as stated in his brief:

> I. Did the Arbitrator err in modifying the Final Decree of Divorce to grant Wife rehabilitative alimony?
>
> a. Did the Arbitrator err in finding a failure of consideration for Wife's waiver of alimony in the Marital Dissolution Agreement as contained in the Final Decree of Divorce?
>
> b. Did the Arbitrator err in modifying the Final Decree of Divorce to award Wife rehabilitative alimony where Husband demonstrated that there was no material change of circumstances after the divorce and in that Wife was not entitled to Rule 60 relief?
>
> c. Did the Arbitrator err in modifying the Final Decree of Divorce to award Wife rehabilitative alimony where Wife voluntarily resigned her employment with Husband's companies?
>
> II. Alternatively, if Husband breached his contractual obligations contained in the Marital Dissolution Agreement, did the Arbitrator err in modifying the Final Decree of Divorce to award Wife rehabilitative alimony considering that Wife failed to mitigate her damages by rejecting substantially similar employment?
>
> III. Alternatively, if the Arbitrator correctly awarded rehabilitative alimony, did the Arbitrator err in his determination of the amount of (1) Wife's future earnings, (2) Husband's alimony arrearage and (3) Wife's rehabilitative alimony award?
>
> a. Did the Arbitrator err in his determination of the amount of Wife's future earnings with Husband's companies?

---

[6] Husband made a Motion *Ore Tenus* Pursuant to Rule 62 of the Tennessee Rules of Civil Procedure requesting a stay of execution on the judgment pending appeal, which was subsequently denied by Order of September 17, 2001. Pursuant to the Order of Judgment, garnishment on Husband's bank account was issued on November 6, 2001 in the amount of $77,086.23. Husband filed a Motion to Quash Garnishment or in the Alternative to Set Installment Payments, which was granted by the trial court's Order Releasing Funds Pursuant to Garnishment dated December 3, 2001.

b. Did the Arbitrator err in his determination of the amount of Husband's arrearage?

c. Did the Arbitrator err in his determination of the amount of Wife's rehabilitative alimony award by failing to consider the most important statutory factors?

IV.  Did the Arbitrator err in awarding Wife 12.5% of the stock in Husband's businesses considering Husband did not own any stock in Al's Cycle Shop, Inc. at the time of the divorce?

V.  Did the Arbitrator err in awarding Wife $25,000 in attorney fees considering that (1) there was no defined time period for the transfer of marital assets, (2) Wife received sufficiently liquid settlement in the divorce and Arbitrator's award to provide her funds from which to pay her attorney fees?

Wife raises the following additional issues in her brief:

I.  Whether Wife is entitled to an award of attorney fees incurred in defending this appeal?

II.  Whether the Arbitrator erred in limiting the duration of Wife's alimony award?

III.  Whether the Arbitrator erred in awarding Wife only $25,000 of the attorney fees and expenses incurred by her in enforcing the parties' Marital Dissolution Agreement.

The Uniform Arbitration Act, T.C.A. § 29-5-301 - 320 (2000) "governs the scope of judicial review of arbitration awards." *Arnold, et al v. Morgan Keegan & Company, Inc.*, 914 S.W.2d 445, 448 (quoting *International Talent Group, Inc. v. Copyright Management, Inc.*, 769 S.W.2d 217, 218 (Tenn. Ct. App. 1988).  In *Arnold*, the Supreme Court explained in detail the standard of review for appeals of arbitration proceedings:

[W]hen the Court of Appeals reviews a trial court's decision in an arbitration case, it should review findings of fact under a "clearly erroneous" standard.

\*                      \*                      \*

Our attitude toward review of arbitration decisions is deferential, as is our standard of review.  Under this deferential

-15-

standard of review, courts are not permitted to consider the merits of an arbitration award even if the parties allege that the award rests on errors of fact or misrepresentation of the contract.

Judicial review of arbitration decisions is statutorily limited, and any judicial review must be conducted within those limits. . . .

Matters of law, if not able to be resolved by resort to the controlling statutes, should be considered independently, with the utmost caution, and in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution.

914 S.W.2d at 449-50 (citations omitted).

In providing guidance for appellate review, the Court further stated:

We further note that Tenn.Code Ann. § 29-5-313(a) specifically provides that "[t]he fact that the relief was such that it could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm the award." Tenn.Code Ann. § 29-5-313(a)(5). Thus, an arbitration award is not subject to vacation for a mere mistake of fact or law.

*Id.* at 450-51 (citations omitted).

Before reviewing the issues, we reiterate that arbitration came about by virtue of a consent order entered into by the parties in which the parties agreed that the "matter" should be referred to an arbitrator and that "the parties agree that the award of the arbitrator shall be binding and that appeal shall be taken to the Tennessee Court of Appeals pursuant to the Tennessee Rules of Appellate Procedure." It is clear that this proceeding does not involve an alternate dispute resolution contemplated by Rule 31, Rules of the Supreme Court.

Each party submitted a Position Statement, which included the issues to be determined by the arbitrator. Wife's issues are as follows:

a. Plaintiff's request to be relieved from the alimony waiver clause contained in the parties' Marital Dissolution Agreement pursuant to Tennessee Rule of Civil Procedure, Rule 60 and for an award of alimony based on her needs and the Defendant's ability to pay.

b. In the alternative to Plaintiff's claim for alimony, Plaintiff's claim for breach of contract against the Defendant resulting from

the Defendant's intentional conduct enforcing Plaintiff from the employment position at Al's Cycle Shop, Inc.

c. The issue regarding the division of the parties' IRAs and Defendant's stockholder interest in Al's Cycle Shop, Inc., pursuant to the parties' Marital Dissolution Agreement.

d. The issue of Plaintiff's entitlement to an award of attorney's fees in relation to her Petition filed on July 25, 1996.

e. The issue of the division of the proceeds from the sale of the parties' Pickwick Lake Property.

f. The issue of whether the Defendant failed to maintain Plaintiff as the sole beneficiary of the Defendant's life insurance policies which were in effect at the time the parties entered into their Marital Dissolution Agreement.

g. The issue of Plaintiff's entitled to an award of attorney's fees in relation to Plaintiff's Amendment to Petition (filed February 12, 1997) and Second Amended Petition (filed Octoboer 16, 1998) to enforce the parties' Marital Dissolution Agreement as a result of the Defendant's refusal to divided the Marital Assets with Plaintiff.

Husband set forth the following issues for determination by the Arbitrator in his Position Statement:

a. The definition of "Marital Assets" referred to paragraph 4 of the Marital Dissolution Agreement.

b. The amount of stock owned by Husband in Al's Cycle Shop, Inc. on July 17, 1995 (the date of the execution of MDA). Value is not an issue, only the amount of stock to be divided.

c. The position of the Wife as to whether she desires Rule 60 relief to set aside the MDA, to modify the MDA by an award of alimony or to enforce the MDA according to its terms. Her response to the amended motion for Rule 60 relief filed by the Husband objects to Rule 60 relief.

d. The amount of all IRAs to be divided.

-17-

e. The existence and/or termination of the Union Central Life Insurance Policy No. 042690054.

f. The applicable procedure remedies available to the parties in this litigation.

We will now consider Appellant's issues:

**Did the Arbitrator err in finding a failure of consideration for Wife's waiver of alimony in the Marital Dissolution Agreement as contained in the Final Decree of Divorce?**

Although the MDA did not provide for alimony, the Arbitrator found from the evidence presented that Ms. Alexander's agreement to waive alimony was based upon Mr. Alexander's promise of future employment at ACS, to wit:

> The Arbitrator finds that at the time the parties entered into the Marital Dissolution Agreement, Husband was the manager and de facto owner of Wife's employers, ACS and SeaDoo. Husband had the ability to provide for Wife's continued employment in those businesses, and based upon this understanding of Wife's continued employment (MDA para. 5), Wife waived her claim to alimony after the 24 year marriage. The Arbitrator finds that there was a failure of consideration for Wife's waiver of alimony, and that the Marital Dissolution Agreement should be modified to require that Husband pay Wife alimony in the manner set out herein.

We have reviewed the entire record in this case. The record is replete with evidence that shows that Mr. McAlexander's demeanor toward his Wife changed for the worse following their divorce.[7] Tammy Morris, who was employed at ACS during this time testified, in relevant part, as follows:

> Q. How did he [Mr. McAlexander] begin treating her [Ms. McAlexander] right after the divorce occurred?
>
> A. Rude and kind of obnoxious toward her.
>
> Q. Did you ever witness him yell at her in front of customers?

---

[7] For purposes of this appeal and the issues before this Court, we will limit our discussion of the record to those incidents that allegedly occurred in the workplace. We note, however, that the record contains ample evidence of Mr. McAlexander's hostile behavior toward his ex-wife outside of the workplace.

A. Yes.

Q. Would he use vulgarities in front of customers towards her?

A. Yes.

Q. Did you ever witness Mr. McAlexander act in a verbally abusive manner towards Ms. McAlexander in front of her co-employees?

A. Yes.

Q. Did you ever witness Mr. McAlexander to use vulgarities towards Ms. McAlexander in front of her co-employees?

A. Yes.

Q. What kind of effect did that have of Ms. McAlexander?

A. I think it scared her, put some fear into her.

Q. Did you ever witness her exhibit any kind of reaction as a result of this type of conduct on Mr. McAlexander's behalf?

A. She was just scared of him, I think.

Q. Did you ever see her cry?

A. Almost on a daily basis.

Ms. McAlexander testified that Mr. McAlexander threw a yellow pages phone book at her in the workplace. Ms. Morris corroborated this testimony as follows:

Q. Did you ever happen to see an incident where Mr. McAlexander and Ms. McAlexander were in an argument in the office?

A. Yes.

\*                                    \*                                    \*

Q. Could you see Mr. McAlexander and Ms. McAlexander engage in a discussion?

A. Uh-huh. Sure.

-19-

Q. What kind of–was it a discussion, or what did it appear to be to you?

A. It might have started out as a discussion, but evidently it wasn't because the phone book came flying across the room towards her [Ms. McAlexander].

Q. Was there anybody else in the room [besides Mr. McAlexander and Ms. McAlexander]?

A. No.

Q. Did it [the phone book] come from the direction where Mr. McAlexander was in the room?

A. Yes.

*                                    *                                    *

Q. How often would Mr. McAlexander engage in this type of conduct towards Ms. McAlexander at work?

A. Pretty much every day. Not like throwing stuff at her or nothing [sic] like that, but it was the–you couldn't hear what they were saying, but you could tell that they were in there yelling at each other and stuff.

Concerning the atmosphere in the workplace, Ms. McAlexander testified, in pertinent part, as follows:

Q. What else [besides the phone book being thrown] occurred?

A. I [Ms. McAlexander] had to teach Al how to do the payroll.

*                                    *                                    *

A. ...we would go upstairs because that's where the computer for the payroll was. And so I showed him–I was showing him how to do this. And he rubbed up against me and fondled my breasts. And I didn't like it. And I told him not to do it anymore. As a matter of fact, after that, I locked the door. I locked the upstairs door so he could not get in.

-20-

Ms. McAlexander also testified that, after the divorce, Mr. McAlexander prohibited her receipt of personal calls at work:

> Q. ...[W]as there any company policy prohibiting the receipt of personal phone calls at work?
>
> A. No.
>
> Q. Okay. Now, after you signed this marital dissolution agreement, did Mr. McAlexander give any direction regarding your receiving personal phone calls?
>
> A. I didn't know that he did until one of the employees came to me and told me that Al had instructed them not to give me any phone messages...
>
>     *                    *                    *
>
> Q. All right. Now, who was it to whom Mr. McAlexander gave the directions to not let you have any personal phone calls?
>
> A. The parts department, to my knowledge.

Concerning Ms. McAlexander's reason for leaving her job at ACS, Mr. McAlexander testified, in relevant part, as follows:

> Q. Now, you've [Mr. McAlexander] heard the testimony of the witnesses thus far saying that...you had a course of conduct of harassing her [Ms. McAlexander].... Did those things happen that were testified to by these parties?
>
> A. I might have been emotional one night in drinking, but I've never touched a woman or anything like that in my life. I'm not that type of person.
>
> Q. Did your wife express after the divorce an unwillingness to perform her job?
>
> A. Well, she left.
>
> Q. Did her work continue on the same quality after the divorce as it was before the divorce?

-21-

A. Not really.

Q. Well, tell us what happened.

A. Well, after that she would–she would stay gone a lot, go get her nails done, talk to her friends on the phone all day.  So some of the things that she normally did were sort of set aside. Now, I stayed away as much as I could because I was upstairs.  She was downstairs with my mom, but I don't think the performance was as good, but I needed her.  I needed her as far as an employee.  She really put me in a bind when she left.

\*                          \*                          \*

Q. When did she first tell you she was leaving [her job]?

A. I don't think she told me.  I think she told my mom.  I don't recall the date.  I know I tried to talk her our of leaving because I really needed her.  At the time I didn't really have anybody in the office.

Q. So you didn't want her to leave?

A. No, I didn't.

Q. Did she ever complain you were harassing her and that she was going to have to leave because of that?

A. No.

Q. Did you ever give any direction to any of your employees not to forward personal calls to your wife?

A. I didn't.  My mother might have, but I didn't.

Obviously, there is some dispute in the record as to whether Mr. McAlexander's behavior toward Ms. McAlexander in the workplace was so hostile that it became impossible for her to receive the benefit of her bargain (i.e. future employment and salary from ACS in exchange for waiver of alimony).  We note that when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trier of fact who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues.  *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997).  The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility

-22-

accorded will be given great weight by the appellate court. *See id.; In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

From our review of the entire record, we do not find that the evidence preponderates against the Arbitrator's finding that Ms. McAlexander could not work at ACS because of Mr. McAlexander's behavior. There is ample evidence to support the Arbitrator's finding that there was a failure of consideration for Ms. McAlexander's agreement to waive alimony in the MDA. Because the evidence supports this conclusion, the Arbitrator's award of alimony is not clearly erroneous. We, therefore, affirm.

**Did the Arbitrator err in modifying the Final Decree of Divorce to award Wife rehabilitative alimony where Husband demonstrated that there was no material change of circumstances after the divorce and in that Wife was not entitled to Rule 60 relief?**

Concerning any material change of circumstances after the divorce and Wife's entitlement to relief based upon those changed circumstances, the Arbitrator found as follows:

> Prior to the date of the parties' divorce, Wife did not experience any problems with her employment at Husband's businesses from Husband or otherwise. Wife and her witnesses testified that immediately following entry of the parties' Final Decree of Divorce, Husband began engaging in a pattern of abusive and hostile conduct towards Wife at work. Husband admitted he threw a mobile phone to the floor at Wife's home; admitted calling Wife and her friends obscene names; admitted drinking to excess and leaving Wife's home in a cab. Much of the other hostile and abusive behavior to which Wife testified was not denied by Husband. Wife terminated her employment at Husband's businesses in January 1996.

Under the preceding issue, we have recounted the testimony related to Husband's alleged actions in the workplace following the parties' divorce. We find that the evidence supports the Arbitrator's finding that there was, indeed, a change in Husband's demeanor and interaction with Wife following the divorce. In his testimony, Husband does not deny that he acted rashly toward Wife. We find that there is sufficient evidence to support the Arbitrator's finding that there was, indeed, a material change in circumstances following the divorce, such that Wife was entitled to relief.

**Did the Arbitrator err in modifying the Final Decree of Divorce to award Wife rehabilitative alimony where Wife voluntarily resigned her employment with Husband's companies?**

Husband argues that Wife should not be awarded alimony because she "voluntarily

resigned her employment with Husband's companies." Husband cites the following testimony in support of his position that Wife voluntarily resigned from ACS:

Q. When did she first tell you she was leaving?

A. I don't think she told me. I think she told my mom. I don't recall the date. I know that I tried to talk her out of leaving because I really needed her. At that time, I didn't really have anybody in the office.

Q. So you did not want her to leave?

A. No, I didn't.

Q. Did she ever complain you were harassing her and that she was going to have to leave because of that?

A. No.

\*                                        \*                                        \*

Q. I assume that your wife came to work for a few weeks before she left your employment?

A. Yes.

Q. Did she ever tell you why she was leaving?

A. Other than–the only thing she said was, 'It's not going to work, me working around you.'

Q. You didn't fire her?

A. No.

Q. You didn't tell her you wanted her to leave?

A. I wanted her to stay. I gave her a raise two weeks before she left.

We have recounted, *supra*, the relevant testimony propounded by Wife to support her contention that Husband's actions at the workplace were the direct cause of her leaving ACS. The word "voluntary" implies freedom and spontaneity of choice or action without external compulsion. In the instant case, there is ample evidence in the record to support the Arbitrator's finding that Wife's leaving ACS was not voluntary but rather compelled by Mr. McAlexander's

actions in the workplace, including throwing a phone book, blocking receipt of personal phone calls, name calling and yelling.  Since the evidence does not preponderate against the Arbitrator's finding on this issue, we affirm.

**Alternatively, if Husband breached his contractual obligations contained in the Marital Dissolution Agreement, did the Arbitrator err in modifying the Final Decree of Divorce to award Wife rehabilitative alimony considering that Wife failed to mitigate her damages by rejecting substantially similar employment?**

Husband asserts that Wife is not entitled to damages because she has failed to mitigate her damages by rejecting substantially similar employment.  We disagree.  Having found above that Husband breached his contractual obligations found in the MDA, we note that, under the doctrine of mitigation of damages, an injured party has a duty to exercise reasonable care and due diligence to avoid loss or minimize damages after suffering injury. *Kline v. Benefiel*, No. W1999-00918-COA-R3- CV, 2001 WL 25750, at *7 (Tenn.Ct.App. Jan. 9, 2001) (citing *Cook & Nichols, Inc. v. Peat, Marwick, Mitchell & Co.*, 480 S.W.2d 542, 545 (Tenn.Ct.App.1971); *Gilson v. Gillia*, 321 S.W.2d 855, 865 (Tenn.Ct.App.1958)).  Generally, one who is injured by the wrongful or negligent act of another, whether by tort or breach of contract, is bound to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage, and to the extent that his damages are the result of his active and unreasonable enhancement thereof, or due to his failure to exercise such care and diligence, he cannot recover. *Cook & Nichols, Inc.*, 480 S.W.2d at 545.  In determining whether an injured party has fulfilled its duty to mitigate, a court must examine "whether the method which he employed to avoid consequential injury was reasonable under the circumstances existing at the time." *Action Ads, Inc. v. William B. Tanner Co., Inc.*, 592 S.W.2d 572, 575 (Tenn.Ct.App.1979) (quoting *Tampa Electric Co. v. Nashville Coal Co.*, 214 F.Supp. 647, 652 (M.D.Tenn.1963)). Despite this duty, an injured party is not required to mitigate damages where such a duty would constitute an undue burden. *Kline*, 2001 WL 25750, at *7 (citing *Cummins v. Brodie*, 667 S.W.2d 759, 766 (Tenn.Ct.App.1983)).

Turning to the record in this case, we find the following, relevant testimony concerning Ms. McAlexander's attempts to find employment after leaving ACS:

> Q. Now, after you [Ms. McAlexander] resigned [from ACS], did you try to find another job?
>
> A. Yes.
>
> Q. I believe you testified you did something at Christ United Methodist Church.

A. I did. I went to the breakfast on Tuesday mornings at 6:30 in the morning. And you give your resume. And then I went to Morgan Keegan. I put my resume in. I went to Bellevue and gave my resume there. I went to a temp.

Q. What is a temp?

A. Temp–it's a temp agency. I just left my resume there.

Q. Now, did you receive any job offers?

A. No.

Q. When did you finally find a job?

A. It was–I think it was February the 1st or March the 1st. I'm not sure. It was at Road Show BMW.

*                                    *                                    *

Q. ... Ms. McAlexander, were you able to find a job that paid as much as the job that you had at Al's Cycle Shop?

A. No.

Q. What was your initial compensation arrangement with Road Show BMW?

A. I was paid $2,000 a month. And if I made anything over $2,000, when I sold a car, it was 25 percent of the profit. And I did not get that 25 percent until I made up my $2,000. If I did not make it up, I still received $2,000 a month.

*                                    *                                    *

Q. How long did you work at Road Show BMW?

A. A year.

*                                    *                                    *

-26-

Q. Now, did you have any problems with your job at Road Show BMW in terms of hours?[8]

A. The hours were hard on me. They were very, very long, and you very seldom got a day off.... I did it for a year. And I was having a lot of problems with my stomach because I have irritable bowel syndrome. And the stress was just too much. And I just couldn't do it anymore.

Q. And did you consult a physician about it?

A. Yes.

Q. And why did you leave the employment of Road Show BMW?

A. For health reasons.

*                           *                           *

Q. Now, how long did it take you to find another job after you left Road Show BMW?

A. I got one right away. It was probably two weeks.

Q. And where did you find that job?

A. East Memphis Internal Medicine at a doctor's office, an internal medicine doctor at St. Francis.

Q. And what job did you have?

A. It was medical records. I was in charge of–there were three doctors. And I was in charge of their records from the hospital and answering the phone, making the appointments from 8:30 to 5:00.

*                           *                           *

Q. Was that job more suitable to you in terms of your health?

---

[8] Ms. McAlexander testified that her usual hours of employment at Road Show BMW were 8:00 a.m. until 8:00 p.m. In October (with daylight savings time), her schedule would rotate, working 8:00 a.m. to 6:00 p.m., or 9:00 a.m. to 8:00 p.m. Although the hours varied slightly, Ms. McAlexander testified that she worked six days a week.

A. Yes.

Q. It paid the same amount of money or less?

A. A lot less.

Q. What was your pay there?

A. Nine dollars an hour. And then I got a raise. And I made $9.37 an hour. My insurance was paid for.

\*                              \*                              \*

Q. When did you leave East Memphis Internal Medicine Clinic?

A. I don't know. I left there March the 1st.

Q. Which year?

A. 1999.

\*                              \*                              \*

Q. Ms. McAlexander, where do you work now?

A. I work for Urology Center of the South. I work for four urologists at Germantown Methodist, and I'm a receptionist.

Q. And how much do you get paid?

A. Ten dollars an hour.

Q. Is that more than you got paid at East Memphis Internal Medicine.

A. Yes.

Q. Why did you leave East Memphis Internal Medicine?

A. I got a better job.

Q. Why do you say it's better?

A. It's more money.

-28-

From our review of the entire record and in light of Ms. McAlexander's previous work experience, education, and health issues, we find that she did not fail to exercise reasonable diligence in mitigating her damages by seeking comparable employment.

### Did the Arbitrator err in his determination of the amount of Wife's future earnings?

Husband asserts that the Arbitrator erred in calculating the amount of Wife's future earnings in that the Arbitrator included Wife's 1995 bonus in his calculation. The Award of Arbitrator reads, in pertinent part, as follows:

> The proof showed that Wife's income from Husband's businesses in 1994 was $29,770 and $50,045 in 1995. Wife's 1995 income included a bonus of $10,000. She admitted that she did not receive a bonus in 1994. Husband testified that bonuses were not paid after 1995. There was no proof of Wife's income from the businesses prior to 1994. Since there is an uncertainty as to what Wife would have received from Husband's businesses had her employment not been terminated, the Arbitrator finds that for the purposes of this ruling her income would have been $43,286 per year. (The Arbitrator considered simply averaging the two years' employment, or taking her 1995 income and removing the bonus, or a weighted average of the income from the years.)

In terms of Ms. McAlexander's compensation from Husband's businesses, the MDA reads, in relevant part, as follows:

> ...Wife will continue to work in a management position in Al's Cycle Shop, Inc. and Al's Sea Doo Too and will receive whatever compensation she has previously been receiving from such business. Wife will continue to receive her year-end bonus from the businesses as long as she maintains her management-level position in Al's Cycle Shop, Inc. and Al's Sea Doo Too.

Clearly the MDA contemplates inclusion of year-end bonuses in Wife's future earnings. However, Husband argues that the Arbitrator should have used Wife's two year average income less her 1995 bonus because the Arbitrator found that the company had not paid any bonuses after 1995. We disagree. The bargain contemplated in the MDA allowed for bonuses to Wife regardless of the compensation paid to other employees of ACS. From our reading of the 1995 MDA, it appears that Husband agreed to pay Wife her monthly salary plus bonuses, which would have been approximately $50,600 per year. The determination of future earnings made by the Arbitrator actually works an advantage to Husband in that the Arbitrator

did not consider the fact that ACS paid Wife's health insurance, life insurance, gasoline credit card, and cellular phone bill.  In addition, Wife's 1994 salary, which was significantly less than her 1995 salary and not in line with the amount guaranteed by the MDA, was averaged into the equation used by the Arbitrator in his determination of Wife's future earnings.

### Did the Arbitrator err in his determination of the amount of Husband's arrearage?

Husband contends that the Arbitrator failed to consider Wife's annual gross income from all sources in 1996 in calculating the amount Husband owed in alimony arrearage.  According to Trial Exhibit 32, Wife's income in 1996 was as follows:

<u>Calculation of 1996 Damages</u>

| Total wages earned | <u>$35, 120.00</u> |
|---|---|
| Al's Cycle Shop | $1,100.00 |
| Mister B's | $ 194.00 |
| Staff Line | $ 762.00 |
| Roadshow BMW | $33,064.00 |

In making his determination of alimony arrearage owed by Husband, the Arbitrator ruled as follows:

> Therefore, the Husband's alimony obligation to Wife for the years 1996 through 2000 will be an amount equal to $43,286 per year [amount of Wife's future earnings from ACS as calculated by Arbitrator, see *supra*] less the amount of Wife's actual earnings for those years.  The alimony will be calculated as follows:
>
> | Year | Wife's actual income | Alimony Award |
> |---|---|---|
> | 1996 | $33,064 (Trial Ex. 6) | $10,222 |
> | 1997 | $27,126(Trial Ex. 8) | $16,160 |
> | 1998 | $21,204(Trial Ex. 10) | $22,082 |
> | 1999 | $20,680(Post trial Ex.) | $22,606 |
> | 2000 | (To be calculated after W-2 is received by Arbitrator) | |
>
> \*                    \*                    \*
>
> The alimony arrearage through 2000 will be calculated as set out above and the total amount will be paid from Husband to Wife in

-30-

equal quarterly installments with no interest over a two year period
with the first quarterly payment to be paid on April 1, 2001...

According to the Award of Arbitrator, the document used by the Arbitrator to calculate Wife's gross income for 1996 was Trial Exhibit 6, which is Wife's W-2 from Roadshow BMW. Beginning in 1997, the Arbitrator used Wife's Income Tax Return to determine her annual income for each year. We believe that Wife's Income Tax Return should have been the basis for the Arbitrator's determination of her annual income for 1996 as well. Turning to Wife's 1040 Income Tax Return for 1996, which is Trial Exhibit 9, we find that her annual income for that year was, indeed, $35,120 and not $33,064. We, therefore, modify the Award of the Arbitrator to reflect a credit of $2,056 against Husband's 1996 alimony arrearage.

### Did the Arbitrator err in his determination of the amount of Wife's rehabilitative alimony award by failing to consider the most important statutory factors?

Husband argues that the Arbitrator failed to consider the two most important factors in an award of alimony, namely Wife's financial need and Husband's financial ability to pay. Husband contends that the sole basis for the determination of an award of rehabilitative alimony in this case was the attempt of the Arbitrator to supplement Wife's income to the level he felt she would make had she continued to work in Husband's companies. We disagree. In the Order on Defendant's Application for Modification of Award of Arbitrator, entered on June 6, 2001, the Arbitrator makes the following, relevant, statements:

It further appears to the Arbitrator that the Defendant has complained that the Arbitrator did not consider T.C.A. § 36-5-101(d)(1) in awarding the alimony herein. However, the Arbitrator did consider all of the criteria contained in that statute in making the award...

T.C.A. § 36-5-101(d)(1) reads, in relevant part, as follows:

(d)(1) It is the intent of the general assembly that a spouse who is economically disadvantaged, relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. Where there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, including those set out in this subsection, then the court may grant an order for payment of support and maintenance on a long-term basis.... In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the

-31-

nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

(A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
(B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;
(C) The duration of the marriage;
(D) The age and mental condition of each party;
(E) The physical condition of each party, including, but not limited to physical disability or incapacity due to a chronic debilitating disease;

\*                              \*                              \*

(G) The separate assets of each party, both real and personal, tangible and intangible;

\*                              \*                              \*

(I) The standard of living of the parties established during the marriage;
(J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
(K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and
(L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

There is nothing in the record to indicate what weight the Arbitrator gave to each of the criteria listed in T.C.A. § 36-5-101(d)(1). However, there was substantial evidence of the factors enumerated in T.C.A. § 36-5-101(d)(1) presented at the arbitration hearing. At the time of the hearing, Ms. McAlexander was forty-nine years old, she had two years of college education but had not completed her undergraduate degree. The parties had been married since June 25, 1970. During the marriage, Ms. McAlexander had worked outside the home (except when the parties' child was young) in mostly secretarial positions, which paid an hourly rate. During his

testimony, Husband admitted that Wife had no income other than that from ACS at the time of the divorce and that he would have been obligated to pay alimony had she not had that income:

> Q. .... If your wife had not been employed by Al's Cycle Shop or anyone else at the time of the final decree of divorce, would you have been willing to pay her alimony?
>
> A. Yes, sir, I would have, but I thought that her having the house was in lieu of alimony. I mean, I didn't–
>
> Q. Well, the house didn't generate any income to her, did it?
>
> A. No.
>
> Q. Other than her income at Al's Cycle Shop, did she have any appreciable income at the time you-all got a divorce?
>
> A. No, sir.

From our review of the entire record, we do not find that the evidence preponderates against the Arbitrator's finding regarding the basis for awarding alimony to Wife; therefore, the Arbitrator's decision is not clearly erroneous.

We now address Wife's second issue, which concerns the award of alimony:

### Whether the Arbitrator erred in limiting the duration of Wife's alimony award?

The Arbitrator determined that Wife's alimony would terminate automatically upon the earliest to occur of the following: Wife's death or remarriage, Husband's death, or September 1, 2005. Because the MDA provides for Wife's continued employment with ACS following the parties' divorce, Wife contends that alimony should continue until she reaches the age of normal retirement, sixty-five (65). We do not agree. Based upon the evidence presented concerning Wife's employment following her termination at ACS, we agree with the Arbitrator that rehabilitation is probable in this case. Even given Wife's health issues, age, and level of education, the evidence supports a finding that she is capable of holding a job, which pays a liveable rate.

### Did the Arbitrator err in awarding Wife 12.5% of the stock in Husband's businesses considering Husband did not own any stock in Al's Cycle Shop, Inc. at the time of the divorce?

Paragraph 5 of the parties' MDA provides, in relevant part, as follows:

The parties will equally divide the balance of their marital assets in equal shares including Husband's stockholder interest in Al's Cycle Shop, Inc....

Concerning the division of these shares of ACS stock, the Arbitrator found as follows:

The Arbitrator finds that at the time of the signing of such Agreement, Husband owned 10 shares of stock in Al's Cycle Shop, Inc., and that there were a total of 40 shares of stock outstanding at the time in the Company. Therefore, Husband owned a 25% interest in said Company at that time. In order to carry out the terms of their Agreement, Husband is hereby ordered to transfer to Wife one-half (½) of his shares in said Company. After such transfer, Wife will own 12.5% of the outstanding stock in said Company...

Husband asserts that the Arbitrator erred in awarding Wife 12.5% of the ACS stock because Husband did not own any ACS stock at the time of the parties' divorce. Specifically, Husband claims that his mother's *inter vivos* gift of ACS stock did not constitute a valid and complete gift. Husband claims that because the gift was incomplete, he did not have any ownership interest in ACS stock on the date of the execution of the MDA. Thus, according to Husband, he was not obligated to transfer any ACS stock to Wife. We disagree.

From our reading of the following testimony, it appears that Husband stipulated to his ownership of ten (10) shares of ACS stock:

MR. DUNCAN [Arbitrator]: For the record then, it is admitted that at the time of the divorce Mr. McAlexander owned ten shares of stock in Al's Cycle Shop. The question is what percentage of that–of the whole.

MR. WAMPLER [attorney for Husband]: That's right.

MR. BLACK [attorney for Wife]: I think it's limited to that, that's correct.

Q [by Mr. Wampler]. And the transfer of this stock, Mr. McAlexander, is evidenced by Exhibit 5 to your position statement, the note from your mother. Is that correct.[9]

---

[9] Exhibit 5 to Husband's position statement for arbitration was made Trial Exhibit 22. This Exhibit is a letter dated December 30, 1993, from Husband's mother, which reads as follows:

I, KATIE L. McALEXANDER, do hereby give absolutely as a gift to my son, AL

(continued...)

A. That's all I have is that note.

Q. That's what I meant.

A. Yes.

It is well settled in Tennessee that the open court concession by the attorneys in a case constitutes a binding stipulation. ***Bearman v. Camatsos***, 385 S.W.2d 91 (Tenn. 1964); ***Tamco Supply v. Pollard***, 37 S.W.3d 905 (Tenn. Ct. App.2000). Because the question of whether Husband owned any stock in ACS became moot when stipulated to during the arbitration hearing, the Arbitrator was left only with the task of deciding what percentage of the outstanding ACS stock the ten (10) shares represented, whether Wife was entitled to a portion of the ACS stock and, if so, how much.

As to the question of what percentage of the outstanding stock in ACS the ten (10) shares owned by Husband represented, Husband testified that, at the time the MDA was entered, he believed that there were 1,000 shares of outstanding ACS stock:

> Q. At the time of your [Mr. McAlexander's] entering into this marital dissolution agreement, did you know how much stock was outstanding in the corporation and issued?
>
> A. I was under the understanding it was a thousand shares.
>
> Q. When did you discover that instead of a thousand shares it was less than that?
>
> A. Upon my mom's death.
>
> Q. How many shares did you discover were in fact issued and outstanding?
>
> A. Only 40 shares.

Based upon this misunderstanding, Husband contends that, in negotiating the MDA, he bargained to give Wife one-half of a one percent (1%) ownership in ACS he thought he had, as opposed to one-half of the twenty-five percent (25%) ownership he actually had. There is no dispute in the record that Mr. McAlexander's attorney drafted the parties' MDA. It is also well settled that the

---

[9](...continued)

> W. McALEXANDER, III, ten (10) shares of common stock of Als Cycle Shop, Inc. on this date as above written. These shares will be transferred upon the secretary of the corporation transferring same upon the corporation books and records, but this gift is to be effective as of the date herein written.

interpretation of a written contract is a matter of law, and thus, no presumption of correctness in its interpretation exists. ***NSA DBA Benefit Plan, v. Connecticut Gen. Life Ins. Co.***, 968 S.W.2d 791 (Tenn. Ct. App.1997). Although the cardinal rule in the construction of contracts is to ascertain the intent of the parties, ***West v. Laminite Plastics Mfg. Co.***, 674 S.W.2d 310 (Tenn.Ct.App.1984), it is also well settled that, if the contract is plain and unambiguous, the meaning thereof is a question of law, and it is the Court's function to interpret the contract as written according to its plain terms. ***Petty v. Sloan***, 197 Tenn. 630, 277 S.W.2d 355 (Tenn.1955). The language used in a contract must be taken and understood in its plain, ordinary, and popular sense. ***Bob Pearsall Motors, Inc. v. Regal-Chrysler Plymouth, Inc***., 521 S.W.2d 578 (Tenn.1975). In construing contracts, the words expressing the parties' intentions should be given the usual, natural, and ordinary meaning. ***Ballard v. North American Life & Casualty Co.***, 667 S.W.2d 79 (Tenn.Ct.App.1983). If the language of a written instrument is unambiguous, the Court must interpret it as written rather than according to the unexpressed intention of one of the parties. ***Sutton v. First Nat. Bank of Crossville***, 620 S.W.2d 526 (Tenn.Ct.App.1981). Courts cannot make contracts for parties but can only enforce the contract which the parties themselves have made. ***McKee v. Continental Ins. Co.***, 191 Tenn. 413, 234 S.W.2d 830 (Tenn.1950).

In the opinion of this Court, the language of the parties' MDA could not be more unambiguous. By its plain language, the parties were to "equally divide...Husband's stockholder interest in Al's Cycle Shop, Inc." As discussed *supra*, Husband stipulated to ownership of ten (10) shares of ACS stock. As to Mr. McAlexander's misunderstanding concerning the amount of outstanding stock, we find that he was in the best position to discover his mistake prior to entering the MDA. Because his own attorney drafted the document, language specifying Mr. McAlexander's desire to bargain one-half of one percent in ACS could have been used. However, what this Court is left with is the rather broad language that was actually inserted in the MDA. As discussed above, this Court cannot make contracts for parties. Absent ambiguities, which we do not have in this case, we must interpret contracts according to their plain language. Consequently, we find that the Arbitrator did not err in awarding Ms. McAlexander one-half of Mr. McAlexander's ten shares of ACS, which amounts to a 12.5% ownership in the company.

**Did the Arbitrator err in awarding Wife $25,000 in attorney fees considering that (1) there was no defined period for the transfer of marital assets, (2) Wife received sufficiently liquid settlement in the divorce and Arbitrator's award to provide her funds from which to pay attorney fees?**

The parties' MDA provides for payment of attorney fees as follows:

> In the event that it should be determined either by this Court or by any other court of competent jurisdiction that either party has breached any provision of this Agreement, then the offending party will pay to the other party reasonable attorney fees and costs incurred in the enforcement of any provision of this Agreement.

Having found that Husband was in breach of certain provisions of the MDA, the Arbitrator made the following ruling concerning payment of attorney fees:

> Paragraph 14 of the parties' Marital Dissolution Agreement provides that in the event it should be determined that either party breached a provision of the Agreement, the breaching party shall pay the non-breaching party's reasonable attorneys' fees and costs incurred in the enforcement of the parties' Agreement. The Arbitrator finds that because of the disparity in the parties' relative abilities to pay fees and because of the relief requested and obtained by Wife herein, including the enforcement of provisions of the parties' Marital Dissolution Agreement, Wife is entitled to an award of attorneys' fees from Husband in the amount of $25,000 which shall be paid in accordance with the provisions of paragraph 16 of this order. Wife shall be responsible for payment of her remaining attorney fees and expenses.

The provision of the MDA regarding payment of attorney fees is clear and unambiguous. Consequently, the award of fees and expenses was not clearly erroneous.

In addressing the question of whether $25,000 was an appropriate amount to award, we concurrently answer Wife's issue concerning whether she is entitled to more than $25,000 in fees and expenses. We find that she is not. The evidence in record does not preponderate against the Arbitrator's award of $25,000. Although the plain terms of the MDA provide for the breaching party's obligation to pay fees accrued in enforcing the contract, we find that, under the circumstances of this case, including Wife's ability to work and the division of marital property, that Wife had sufficient funds of her own from which to pay any remaining attorney fees and expenses beyond the $25,000.

Wife also raises an issue as to whether she is entitled to an award of attorney fees incurred in defending this appeal. Based upon the reasoning above, specifically that Wife has sufficient funds from which to pay her attorney fees and expenses, we find that she is not entitled to recover attorney fees accrued in defending this appeal.

For the foregoing reasons, we affirm the Order of Judgment as modified herein. To clarify, the Award of Arbitrator, as incorporated by reference in the Order of Judgment, is affirmed in all respects except that Husband is to receive a $2,056 credit toward his 1996 alimony arrearage.

### SALE FOR PARTITION

During the pendency of the above appeal, Husband filed a Complaint for Sale for Partition of Marital Property against Wife on October 18, 2001 (the "Partition Action").[10] The Complaint sought partition of the property located at 4511 Barfield Road, Memphis, Tennessee on the following grounds:

> That said Marital Dissolution Agreement does not provide for any specific time limitation within which the parties must sell the home. Said agreement is an unreasonable restraint on the alienation of property, and as such should be modified so that the property can be sold and divided as contemplated by the agreement.

Husband filed a Motion for Judgment by Default on December 20, 2001, which was subsequently denied by Order dated January 17, 2002. Wife answered Husband's Complaint on January 11, 2002. Wife's Answer reads, in relevant part, as follows:

> Wife denies that the parties' Marital Dissolution Agreement does not provide for any time limitation when the parties must sell the Barfield Road home as alleged in [the Complaint]. The parties' Marital Dissolution Agreement specifically provides that the home will be sold upon Wife's remarriage. Wife avers that the terms of the parties' Marital Dissolution Agreement regarding disposition of the Barfield Road home do not constitute an unreasonable restraint on the alienation of property and should not be modified by this court. Rather, Wife respectfully submits that the terms of the parties' Marital Dissolution Agreement regarding disposition of the home should be upheld and enforced by this Court.[11]

On April 5, 2002, Husband filed a Motion for Summary Judgment, along with a Statement of Undisputed Facts and a Memorandum in support of the motion. On June 4, 2002, Wife filed a Response to Husband's Statement of Undisputed Facts and Wife's Statement of Additional Undisputed Facts Pertinent to Husband's Motion for Summary Judgment, along with a Memorandum of Law in Opposition to Husband's Motion for Summary Judgment.

---

[10] The Partition Action was subsequently transferred from the Chancery Court of Shelby County to the Circuit Court of Shelby County by Order dated January 11, 2002.

[11] Wife filed an Amended Answer to Complaint for Sale for Partition of Marital Property on June 24, 2002. In her Amended Answer, Wife advanced the theory that the provision of the MDA addressing the Barfield Road property represented an agreement between the parties not to partition the property, and that Husband agreed to those terms by signing said MDA. In addition, Wife's Amended Complaint alleged that Husband's request for partition was "nothing more than a bad faith attempt on Husband's behalf to free himself of financial commitments he made to Wife in the [MDA]."

Husband's Motion for Summary Judgment was granted by Order entered July 11, 2002. The Order reads, in relevant part, as follows:

> This cause came on to be heard on this 25ᵗʰ day of June, 2002, before the Honorable Rita Stotts, Judge of Division 4 of the Circuit Court of Tennessee for the Thirtieth Judicial District at Memphis, upon the Motion for Summary Judgment filed herein by Plaintiff, Albert W. McAlexander, proper service of notice of said motion upon the Defendant, Marcia Diane McAlexander, Statement of Undisputed Facts filed herein by the Plaintiff, "Wife's Response to Husband's Statement of Undisputed Facts and Wife's Statement of Additional Undisputed Facts Pertinent to Husband's Motion for Summary Judgment," Affidavit of Marcia Diane McAlexander in Opposition to Motion for Summary Judgment, Amended Answer to Complaint for Sale for Partition of Marital Property filed by Defendant, Memorandum of Fact and Law of the respective parties, statement and argument of counsel for the respective parties and the entire record in the cause.
>
> From all of which it appears to the court that there is no genuine issue as to any material fact and that the Plaintiff is entitled to summary judgment as a matter of law;
>
> It further appears to the Court and the Court is aware that the Defendant will appeal this Order Granting Summary Judgment to the Tennessee Court of Appeals, Western Section at Jackson and it is the desire of this Court that the Tennessee Court of Appeals consolidate the appeal of this order with the pending appeal in cause number W2001-02550-COA-R3-CV, Shelby Law No. 149228-4.
>
> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that the Plaintiff's Motion for Summary Judgment be, and the same is hereby granted.
>
> IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that the parties' real property known municipally as 4511 Barfield Road, Memphis, Shelby County, Tennessee 38117 shall be sold by partition subject to the Defendant's right to file a Motion for Stay Pending Appeal in this cause.

An Order granting Wife's Motion for Stay of Enforcement of Order Granting Summary Judgment Pending Appeal and Denying Husband's Motion for Order of Sale was granting on October 15, 2002. The Partition Action was consolidated with Husband's pending appeal in the

divorce action, which we have addressed *supra*. Wife appeals from the Order granting Husband's Motion for Summary Judgment and raises the following issues for our review as stated in her brief:

> 1. Did the Trial Court err in granting Husband a summary judgment ordering that the parties' Marital Residence be sold for partition?
>
> A. Does the parties' Marital Dissolution Agreement contain an implied covenant restricting partition of the Marital Residence until Wife's remarriage which operates as a bar and/or waiver of Husband's right of partition to the property?
>
> B. Is Husband barred from seeking partition of the Marital Residence by the doctrines of estoppel and unclean hands?
>
> 2. In the event the Trial Court's grant of summary judgment to Husband is reversed, should this case be remanded to the Trial Court with instructions for the Trial Court to award Wife attorneys fees and expenses from Husband based on the attorneys fees and expenses incurred by Wife defending Husband's partition action and enforcing her rights under the parties' Marital Dissolution Agreement?

A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *See id.* In *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993), our Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings, but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

*Id.* at 210-11 (citations omitted) (emphasis in original).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *See Carvell v. Bottoms*, 900 S.W.2d 23,

26 (Tenn. 1995).  Since only questions of law are involved, there is no presumption of correctness regarding the trial court's grant of summary judgment.  *See Bain*, 936 S.W.2d at 622.  Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court.  *See Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn. 1997).

T.C.A. § 29-27-101 (2000) provides for partition rights as follows:

> Any person having an estate of inheritance, or for life, or for years, in lands, and holding or being in possession thereof, as tenant in common or otherwise, with others, is entitled to partition thereof, or sale for partition, under the provisions of this chapter.

As evidenced by the language of this statute, Tennessee favors the right to free alienation of property.  *See also Nicely v. Nicely*, 293 S.W.2d 30, 32 (Tenn. Ct. App. 1956).  However, as evidenced by cases such as the one now at bar, there is often a competing interest between the right to free alienation of property and the right to freedom of contract.  Other jurisdictions have ruled that partition will not be granted in violation of an express or implied agreement not to partition.  *See, e.g., Petty v. Griffith*, Mo. Sup., 165 S.W.2d 412; 68 C.J.S. *Partition* § 26 (1998); *Bunch v. Bunch*, 1998 Tenn. App. LEXIS 8, No. 02 A01-9705-CH-00106, 1998 WL 46217 at *3 (Jan. 8, 1998 Tenn.Ct.App.) (citing *Wade R. Habeeb*, Annotation, *Contractual Provisions as Affecting Right to Judicial Partition*, 37 A.L.R.3d 962 (1971)).  Although Tennessee has not gone so far as to recognized any and all contractual agreements prohibiting alienation, we have nonetheless established certain criteria that will make an implied or express agreement not to partition enforceable in our jurisdiction.  In *McGahey v. Wilson,* 2001 Tenn. App. LEXIS 499, No. M2000-01931-COA-R3-CV, 2001 WL 799736 (July 17, 2001 Tenn. Ct. App.), this Court held as follows:

> ...in order to sustain the validity and enforceability of an agreement not to sell or partition realty, where no period of duration is expressly set forth in the writing, the agreement must contain evidence of the purpose for the restraint against sale or partition sufficient to permit the determination of a duration reasonably necessary to accomplish such purpose.

*Id.* at *7-*8.

Based upon this Court's ruling in *McGahey*, in order to sustain the validity of an agreement not to partition real property, the agreement must either contain an express period of duration or the agreement must contain sufficient evidence from which a court can determine the purpose for the restraint and from which the court can set a duration sufficient to accomplish that purpose.  Neither criterion is met in this case.

Paragraph 1 of the parties' MDA reads, in pertinent part, as follows:

....The parties will continue to own the home as Tenants in Common after their divorce. Wife will have the right to live in the home until her remarriage [marked out and initialed by parties] from the date of this Agreement. Upon Wife's remarriage [marked out and initialed by parties] from the date of this Agreement, whichever occurs first, the home will be sold and the net proceeds divided equally between the parties...

We find that this clause of the MDA represents an implied covenant not to partition. The gravamen of Wife's issue, under this Court's ruling in *McGahey*, now becomes whether the term "until her remarriage" is an unlawful restraint on alienation of the property. It is undisputed in the record that, in the original draft of this section of the MDA, the parties had inserted terms (in the spaces indicated above by "[marked out and initialed by parties]") allowing Wife to live in the residence until the earlier of her remarriage or three (3) years from the date of the MDA. Having agreed to delete this express term of three (3) years, the MDA fails to meet the first criterion outlined in *McGahey*, to wit: there is no express period of duration on the agreement not to partition because the term "remarriage" is too dubious and ambiguous to satisfy this criterion.

Turning to the second criterion outlined in *McGahey*, we find that neither the MDA itself nor the record on appeal provides a basis from which this Court can derive the intention of the parties' in using "until her remarriage" as the termination point for their agreement not to partition. Short of conjecture, this Court has no foundation on which to base a determination of the duration for restraint of alienation in this case. Therefore, we find that the MDA, as set forth above, constitutes an unreasonable restraint on alienation. Consequently, Husband is entitled to summary judgment as a matter of law.

However, we cannot overlook the fact that Husband contractually agreed that Wife, as tenant in common, could possess the home until remarriage, and Husband would pay certain expenses and the mortgage payment. This provision of the contract granted to Wife a valuable asset which increases her interest in the property. Thus, a division of the proceeds of the sale should reflect the value of Wife's interest in the property.

In sum, the Order of Judgment on Appellant-Husband's appeal is modified to allow Husband $2,056 credit toward his 1996 alimony arrearage. As modified, the Order of Judgment on Appellant-Husband's appeal is affirmed. The order of the trial court in Appellant-Wife's appeal granting Husband's motion for summary judgment is affirmed. The case is remanded to the trial court for a determination of the value of Wife's interest in the property, including both her ownership and her contractual and possessory rights. Costs of this appeal are assessed one-half to Appellant/Appellee, Albert Wesley McAlexander, and his surety, and one-half to Appellant/Appellee, Marcia Diane McAlexander, and her surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.