NSA DBA BENEFIT PLAN, INC.,
Plaintiff–Appellant,

v.

CONNECTICUT GENERAL LIFE IN-
SURANCE COMPANY, American Pro-
gressive Benefits, Inc. Insurex Benefits
Administrators, Inc., Layne Maupin In-
surance Brokers, and Insurex Agency,
Inc., Defendants–Appellees.

Court of Appeals of Tennessee,
Western Section, at Jackson.

July 23, 1997.

Application for Permission to Appeal
Denied by Supreme Court
March 23, 1998.

Charles C. Harrell, Bradley E. Trammell, Baker, Donelson, Bearman & Caldwell, Memphis, for Plaintiff–Appellant.

Harry P. Cohen, Admitted pro hac vice, Rosenman & Colin LLP, New York, Edward M. Kaplan, Armstrong Allen Prewitt, Memphis, for Appellee, Connecticut General Life Insurance Company.

James H. Drescher, Stockes & Bartholomew, Nashville, for Appellee, American Progressive Benefits, Inc.

CRAWFORD, Presiding Judge, Western Section.

This appeal involves the interpretation of an insurance contract. The plaintiff, NSA DBA Benefit Plan, Inc. (NSA), appeals from the order of the trial court granting summary judgment in favor of two of the defendants, Connecticut General Life Insurance Company (Connecticut General) and American Progressive Benefits, Inc. (APB).[1]

NSA is a Tennessee corporation comprised of NSA Inc., independent distributors of water and air filtration products, educational products, and nutritional supplements. NSA offers a group health plan to the independent distributors that is funded by NSA member participants. Connecticut General is a foreign corporation licensed and qualified to do business in Tennessee that offers "stop loss" insurance plans in Tennessee. APB is an independent contractor that manages and supervises the underwriting of certain insurance products for Connecticut General. Connecticut General issued a "stop loss" policy (the Policy) through APB to NSA for the

---

1. The order was made final pursuant to Tenn. R.Civ.P. 54.02.

group health plan with an effective date of March 1, 1993.

■ A "stop loss" policy provides reimbursement for claims paid by the insured above a certain amount. The Policy in this case provides both specific and aggregate stop loss benefits. The specific stop loss benefit insured NSA for eligible claim payments made on behalf of a covered person less a "specific deductible" of $75,000.00. NSA had to pay the first $75,000.00 of medical expenses for any given covered person, and then Connecticut General had to pay the specific stop loss benefit in excess of $75,-000.00 up to a cap of $925,000.00. Specific stop loss benefits are not an issue in this case.

The aggregate stop loss benefit insured NSA for "eligible aggregate claim payments" made on behalf of covered persons in excess of the "Annual Aggregate Attachment Point." NSA was obligated to pay its members until claims, in the aggregate, reached a certain point, the stop loss point. Any claims paid by NSA beyond that point were to be reimbursed by Connecticut General. The definition of the stop loss point is the central focus of this case.

On the application by NSA for the Policy, NSA indicated that 1,416 individual members would be eligible for the plan. APB used 1,416 participants in its calculations to determine a quote for NSA and to establish an estimated stop loss point. The application, signed by NSA on March 4, 1994, constitutes part of the Policy and provides: "[T]his policy has been approved by the Policyholder and its terms have been accepted by the Policyholder."

The calculation of the "Estimated Annual Aggregate Attachment Point" was based on the information provided by NSA in the application and was established to be $3,901,-581.00. Pursuant to the Policy, however, the stop loss point was not to be determined until the end of the Policy year. The final stop loss point used to determine reimbursement

is called the "Annual Aggregate Attachment Point" and is defined in the Policy as follows: "The greater of (a) the Minimum Aggregate Attachment Point; or (b) the sum of the Monthly Aggregate Attachment Points for each month of the Policy Year." The definition of "Minimum Aggregate Attachment Point" referred to "[t]hat amount specified in the Schedule of Insurance." However, the term "Minimum Aggregate Attachment Point" did not appear in the Schedule of Insurance, but the term "Minimum Annual Aggregate Attachment Point" did. The "Minimum Annual Aggregate Attachment Point" was $3,901,581.00.

NSA paid the premiums pursuant to the Policy for 686 lives on or about March 1, 1993, the first month of the term of the Policy. Less than 50% of the 1,416 eligible members participated in the plan. During the Policy year, NSA paid claims of $1,874,-965.00 to its members, and the sum of the "Monthly Aggregate Attachment Points" was $1,704,656.41. Because NSA paid more than the sum of the monthly points, it expected reimbursement of $170,308.59, and at the end of the Policy year, NSA demanded reimbursement under the Policy in the amount of $170,308.59. However, Connecticut General denied the claim because NSA's payments were less than the "Annual Aggregate Attachment Point." Connecticut General calculated the "Annual Aggregate Attachment Point" to be $3,901,581.00 because the "Minimum Aggregate Attachment Point" ($3,901,-581.00 from the Schedule of Insurance) was greater than the sum of the "Monthly Aggregate Attachment Points" ($1,704,656.41).

On March 20, 1995, NSA filed a complaint against Connecticut General, APB, Insurex Benefits Administrators, Inc., Layne Maupin, and Insurance Brokers. The complaint alleges breach of contract and fraud and misrepresentation as to Connecticut General and APB. The complaint also alleges that the Policy is unconscionable.[2] On April 26, 1996, NSA filed a second amended complaint for damages.[3] The complaint avers that the Pol-

---

2. On September 20, 1995, NSA filed a first amended complaint that added Insurex Agency, Inc. as a defendant.

3. The complaint alleges negligence, failure to procure insurance, breach of contract, and breach of fiduciary duty as to Insurex Benefits Administrators, Inc., Layne Maupin, Insurance

icy was to provide reimbursement to NSA for all claims paid above a certain amount based upon the number of NSA participants covered under the group health plan. The complaint avers that NSA submitted all of the monthly premiums on a timely basis. The complaint also avers that, once the Policy's period had expired, NSA made a formal demand upon Connecticut General and APB for claims paid in accordance with the Policy. The initial demand was for $170,308.59, and the complaint alleges that NSA has been damaged at the minimum in the amount of $170,308.59. The complaint alleges that Connecticut General and APB have breached the Policy because of their refusal to pay NSA's request for reimbursement.

Instead of fraud and misrepresentation, the second amended complaint alleges that the Policy is unconscionable and violates the Tennessee Consumer Protection Act (TCPA). The complaint avers that the Policy was based on 1,416 covered participants, but only 688 participants enrolled. The complaint alleges that Connecticut General and APB knew that $3,908,581.00 was not the correct attachment point for 688 or fewer participants, yet they continued to use that amount. The complaint alleges that the bad faith refusal of Connecticut General and APB to provide stop loss coverage and benefits is a violation of T.C.A. § 56–7–105. NSA also alleges that, through the manipulation of the "estimated annual aggregate attachment point," Connecticut General and APB have employed an unconscionable contract. The complaint states, "This unconscionable agreement ... is a violation of the Tennessee Consumer Protection Act because it allows Defendants CG and APB to unilaterally increase the 'estimated annual aggregate attachment point' at any time to a level that will never be reached and thus no claims will have to be reimbursed."

On May 8, 1996, Connecticut General filed an answer that denied the material allegations of the complaint and raised numerous defenses. On the same day, Connecticut General filed a motion for summary judgment. The motion states that Connecticut General is entitled to summary judgment as a matter of law on the breach of contract claim because no claim has arisen under the clear and unambiguous provisions of the Policy. The motion also states that Connecticut General is entitled to summary judgment on the unconscionable contract claim.

On May 8, 1996, APB also filed a motion for summary judgment stating that the material facts are not in dispute. APB's motion adopted Connecticut General's motion, affidavits, documents, and memorandum of law. On May 24, 1996, APB filed an answer to NSA's complaint that denied the material allegations of the complaint and stated numerous defenses.

On July 8, 1996, the trial court granted the motions for summary judgment in favor of Connecticut General and APB and made the judgment final pursuant to Tenn.R.Civ.P. 54.02. The trial court found that the pertinent provisions of the Policy were "clear, unambiguous, and enforceable" and found that NSA's claim under the TCPA was moot.

NSA appeals from the order of the trial court granting summary judgment to Connecticut General and APB and presents the following issues for review: 1) whether the trial court erred by holding that the provisions of the Policy are clear, unambiguous, and enforceable, and 2) whether the trial court erred by holding that NSA's claim for relief under the TCPA is moot.

A trial court should grant a motion for summary judgment only if the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Tenn.R.Civ.P. 56.03; *Byrd v. Hall,* 847 S.W.2d 208, 210 (Tenn.1993); *Dunn v. Hackett,* 833 S.W.2d 78, 80 (Tenn.App.1992). The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *Byrd,* 847 S.W.2d at 210. On a motion for summary judgment, the court must consider the motion in the same manner as a motion for directed verdict made at the close of the plaintiff's proof; that is, "the court must take

Brokers, and Insurex Agency, Inc. The case continues against these defendants in the Chancery Court of Shelby County, and they are not parties to this appeal.

the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." *Id.* at 210–11. In *Byrd,* the Tennessee Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

*Id.* at 211 (emphasis in original) (citations omitted). Where a genuine dispute exists as to any material fact or as to the conclusions to be drawn from those facts, a court must deny a motion for summary judgment. *Id.* (citing *Dunn,* 833 S.W.2d at 80).

 In construing contracts, the words expressing the parties' intentions should be given the usual, natural, and ordinary meaning, and in the absence of fraud or mistake, a contract must be interpreted and enforced as written, even though it contains terms that may be thought harsh and unjust. *Ballard v. North American Life & Casualty Co.,* 667 S.W.2d 79, 82 (Tenn.App.1983).

In *Blaylock & Brown Construction, Inc. v. AIU Insurance Co.,* 796 S.W.2d 146 (Tenn. App.1990), this Court discussed the interpretation of insurance contracts:

> Insurance contracts like other contracts should be construed so as to give effect to the intention and express language of the parties. In construing and applying insurance policies, the apparent object and intent of the parties must be kept in mind. Language in a contract which happens to be technical or complex to the layman, does not render it ambiguous, and where there is no ambiguity it is the duty of the court to apply to the words used their usual, natural and ordinary meaning. The court cannot, under the guise of construc-

tion, make a new and different contract for the parties.

*Id.* at 149 (citations omitted).

 In construing insurance contracts, this Court is obligated to attempt to determine the intent of the contracting parties, and because the policy was drafted by the insurance company, we must resolve any ambiguity and doubt in favor of the insured. *Spears v. Commercial Ins. Co.,* 866 S.W.2d 544, 550 (Tenn.App.1993). Furthermore, where the language of an insurance policy is reasonably susceptible of two meanings, we are obligated to give the particular language the interpretation most favorable to the insured. *Id.* "Ambiguity" in a contract is doubt or uncertainty arising from the possibility of the same language being fairly understood in more ways than one. *Hillis v. Powers,* 875 S.W.2d 273, 276 (Tenn.App. 1993).

In its first issue, NSA first argues that it presented uncontroverted evidence that the Policy was susceptible of more than one reasonable interpretation and that the trial court inappropriately and incorrectly selected the meaning presented by Connecticut General. NSA argues that two conflicting meanings of the same language create an ambiguity.

NSA submitted the affidavit of Bruce Osborne, president of Insurex Benefits Administrators, Inc. In his affidavit, Osborne stated, "It is my opinion that the annual aggregate attachment point . . . should be based on the actual number of participants in the insurance plan."

 We first note that Osborne's opinion does not create a genuine issue of material fact and, therefore, that summary judgment was appropriate for one of the parties. We must decide whether the legal conclusions on which the trial court's grant of summary judgment was based are correct. The existence of an ambiguity in a written insurance contract and its resolution are for the judge and not the jury. *Moss v. Golden Rule Life Ins. Co.,* 724 S.W.2d 367, 368 (Tenn.App.1986). The interpretation of a written agreement is a matter of law and not of fact, therefore, our review is *de novo* on

the record with no presumption of the correctness of the trial court's conclusions of law. *Union Planters Nat'l Bank v. American Home Assurance Co.*, 865 S.W.2d 907, 912 (Tenn.App.1993).

■ NSA argues that the Policy is ambiguous because it leads one to believe that the stop loss point would be recalculated based on the actual number of participants rather than the estimated number of participants. NSA interprets the Policy to mean that the "Estimated Annual Aggregate Attachment Point" is an estimate that should vary based on the number of actual participants. Connecticut General and APB, on the other hand, state that the stop loss point was "estimated" because the "Annual Aggregate Attachment Point" was not finally determined until the end of the Policy year pursuant to the Policy.

The Policy is clear that the stop loss point would not be determined until the end of the Policy year and, therefore, was merely an estimate until the end of the Policy year. We see no language in the Policy that would lead one to believe that the stop loss point would be recalculated based on the actual number of participants. The "Annual Aggregate Attachment Point" is based on either the actual number of participants through the sum of the "Monthly Aggregate Attachment Points" or the "Minimum Aggregate Attachment Point," whichever is greater. The Policy is clear that the stop loss point is based on actual participants only if the sum of the "Monthly Aggregate Attachment Points" is greater than the "Minimum Aggregate Attachment Point."

■ NSA argues that the insertion of the term "Estimated Annual Aggregate Attachment Point" makes the Policy ambiguous and that the Policy may be reasonably interpreted to mean that the stop loss point was adjustable. The term "Estimated Annual Aggregate Attachment Point" is not defined anywhere in the Policy and is not referenced in the controlling provisions that define "Annual Aggregate Attachment Point." NSA argues that the lack of definitions and the use of confusing terms create an ambiguity in the Policy. However, we believe that the term, "Estimated Annual Aggregate Attach-

ment Point" is superfluous because the controlling provisions clearly reference the "Annual Aggregate Attachment Point." The fact that the term "Estimated Annual Aggregate Attachment Point" is also listed on the Schedule of Insurance does not create an ambiguity. The parties involved were both sophisticated corporate entities that entered into a contract at arms-length. The insertion of one undefined, unused term into a transaction of this nature cannot create such confusion and ambiguity that the contract must be construed against Connecticut General and APB.

■ NSA also argues that the Policy is inequitable and that no reasonable person would enter into this Policy because Connecticut General and APB can manipulate the stop loss point at any time to a level that precludes coverage. NSA complains that the stop loss point can be raised, but can never be lowered. NSA claims that it was never told that the stop loss point could not be adjusted downward if fewer than all the eligible members participated. Connecticut General admitted that it can increase the "Annual Aggregate Attachment Point" in accordance with the terms of the Policy. Connecticut General also admitted that the monthly premium rate or percentage could be modified in accordance with the terms of the Policy.

Connecticut General and APB argue that it defies logic and the English language to suggest that a "minimum" attachment point could be lowered for any reason. We believe that there is not an ambiguity, and we must apply to the words used their usual, natural and ordinary meaning. *Ballard*, 667 S.W.2d at 82. The "Minimum Aggregate Attachment Point" was established to be $3,901,581.00, and the Policy is clear that this is the *minimum*. The usual and ordinary meaning of the provisions of the Policy makes it clear that the stop loss point would never be lower than the "Minimum Aggregate Attachment Point."

■ NSA next argues that Connecticut General's interpretation that the stop loss point would never be lower than $3,901,581.00 is unreasonable because the terms

"Minimum Aggregate Attachment Point" and "Minimum Annual Aggregate Attachment Point" are not synonymous. In the Policy, the "Minimum Aggregate Attachment Point" is defined as "[t]hat amount specified in the Schedule of Insurance." However, a "Minimum Aggregate Attachment Point" is not listed in the Schedule of Insurance. The Schedule of Insurance lists the "Minimum Annual Aggregate Attachment Point" as $3,901,581.00. This term is not included in the definition of "Annual Aggregate Attachment Point" and is not defined in the Policy.

Although this could be confusing, we do not believe that it is ambiguous. It is obvious that the "Minimum Aggregate Attachment Point" refers to the "Minimum Annual Aggregate Attachment Point" on the Schedule of Insurance. We do not believe that it is subject to two interpretations, and therefore, it is not ambiguous.

NSA also argues that Connecticut General's interpretation is unreasonable because the estimate was based on a presumed 100% participation in the plan or on 1,416 participants. Connecticut General points out that there is no evidence in the record that 1,416 participants was the maximum or that 1,416 would be 100% participation. NSA argues that, because the quote was based on 100% participation, it is reasonable to interpret that the stop loss point should be lowered if fewer than 100% participate. However, NSA agreed to and accepted this Policy knowing that the stop loss point was based on 1,416 individuals. We do not believe that the Policy is ambiguous because less than 50% of the eligible individuals participated. The result may be harsh to NSA, but the provisions of the Policy control this dispute.

We note that APB stated, in an interrogatory, that NSA had an affirmative duty to immediately notify all interested and affected parties if the information, data, and facts utilized to underwrite and issue the Policy in question were erroneous and that APB relies on the accuracy of the information provided when underwriting stop loss policies. NSA failed to notify APB that any of the information APB relied upon in preparing the proposal for the Policy in question was inaccurate or false.

Finally, NSA argues that the Policy is ambiguous because of the confusing use of the stop loss point terms. The Policy has many different terms including, "Annual Aggregate Attachment Point," "Minimum Aggregate Attachment Point," "Minimum Annual Aggregate Attachment Point," "Monthly Aggregate Attachment Points," and "Estimated Annual Aggregate Attachment Point." Although two of these terms are not defined, we do not believe that the use of multiple terms makes a contract ambiguous. The contract may be confusing, but is not susceptible to more than one interpretation.

We believe that the language of the Policy is unambiguous and that the trial court correctly ruled that Connecticut General and APB are entitled to summary judgment as a matter of law as to the breach of contract claim.

In its second issue, NSA argues that its claim under the TCPA is not moot because the claim is independent of whether or not the language of the Policy is ambiguous and is separate and distinct from the breach of contract claim. The trial court held that NSA's claim under the TCPA was moot. NSA states the TCPA claim as follows: "[T]he solicitation, sale and manipulation of such a deceptive contract as this one constitute acts for which the Tennessee Legislature has provided remedy through the Tennessee Consumer Protection Act."

The TCPA is to be liberally construed to "protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state." T.C.A. § 47–18–102(2) (1995). The insurance industry is not exempt from the TCPA. *Skinner v. Steele*, 730 S.W.2d 335, 338 (Tenn.App.1987).

We have found that an enforceable, valid contract exists between the parties. We believe the language of the Policy is clear and unambiguous and is not unfair or deceptive. NSA cannot maintain an action under the TCPA in the face of a valid contract without the existence of a false misrepresentation or a deceptive act or practice. *See*

*Brandel v. Moore Mortgage and Inv. Co.,* 774 S.W.2d 600, 607 (Tenn.App.1989).

NSA also asserts that the Policy is unconscionable and that its employment is a deceptive or unfair act. NSA argues that the Policy is unconscionable because Connecticut General and APB can manipulate the stop loss point if the threat of having to pay benefits exists so that no claims are ever paid. APB was aware that claims would not have to be paid under the Policy as early as six months into the policy year. However, the fact that Connecticut General and APB do not have to pay under the Policy, and knew it six months after the Policy was signed, does not make the Policy unconscionable or make its use a deceptive act.

Under the provisions of the Policy, there was a possibility that claims would have to be paid. Connecticut General and APB could not "manipulate" the Policy as alleged by NSA. The clear provisions of the Policy indicate that the stop loss point or the "Annual Aggregate Attachment Point" is the "greater of: (a) the Minimum Aggregate Attachment Point; or (b) the sum of the Monthly Aggregate Attachment Points for each month of the Policy Year." Connecticut General did not have any discretion and could not manipulate the stop loss point. If the sum of the monthly claims from the actual participants exceeded the Minimum Aggregate Attachment Point, then that sum became the stop loss point. If the sum of the monthly claims did not exceed the Minimum Aggregate Attachment Point, then $3,901,-581.00 became the stop loss point. We do not see how Connecticut General and APB can manipulate the Policy in a deceptive trade practice.

NSA also argues that the Policy is deceptive because Connecticut General and APB initiated coverage and then continued to accept premiums when both knew that a claim would not be paid under the Policy. NSA argues that Connecticut General and APB did not meet their own guidelines.

■ In the quote issued by APB to NSA dated May 26, 1993, the "Minimum Annual Attachment Point" is listed as $3,901,581.00.

However, the quote states, "The quote requires at least 75% of eligible employees to participate in the plan." It is uncontroverted that NSA was aware that less than 1,416 individuals participated when it paid the first premium. NSA had knowledge of all of the facts surrounding the issuance of the Policy and was not misled in any fashion. Even though 75% of eligible employees did not participate in the plan, we cannot find a violation of the TCPA because of a lack of deception or misrepresentation.

In a document titled "Application for Stop Loss Insurance,"[4] under section V(a), if there is a "material variance" between the "Plan Document" and the "benefit provisions upon which the terms and rates of the stop loss insurance were based," Connecticut General may either "decline to release the stop loss insurance contract until an acceptable Plan Document is received" or "refund all premiums paid in connection with this application." NSA argues that there is a material variance because less than 50% of eligible employees participated in the plan and that Connecticut General should have either recalculated the stop loss point or refunded all the premiums. However, the "material variance" must have been between the Policy and the "benefit provisions." The Policy had to be restructured or the premiums refunded if there was a change or a difference in the benefits provided, not a change or a difference in the number of participants.

In conclusion, we agree with the trial court that the Policy is unambiguous and that the TCPA does not apply in this case because the Policy is neither deceptive nor unfair. There are no genuine issues of material fact and, pursuant to the provisions of the Policy, Connecticut General and APB are entitled to summary judgment as a matter of law. Accordingly, the order of the trial court is affirmed, and this case is remanded to the trial court. Costs of this appeal are assessed against NSA.

FARMER and INMAN, JJ., concur.

---

4. Three applications for coverage were submitted by NSA at different times.