IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 5, 2025 Session

## GENASH, LLC v. ROSE LEGACY, LLC AS SUCCESSOR IN INTEREST TO AGNOLETTI PROPERTIES, LLC

**Appeal from the Chancery Court for Davidson County**
**No. 20-1295-IV      Russel T. Perkins, Chancellor**

_____

### No. M2024-00186-COA-R3-CV

_____

In this commercial lease dispute, the tenant sued the landlord for breach of contract and fraudulent inducement, and the landlord counterclaimed for breach of contract. The trial court granted the tenant's motion for partial summary judgment on its breach of contract claim, concluding that the landlord breached the lease. The matter then proceeded to trial, where the jury returned a verdict on a list of issues, including damages on the tenant's breach of contract claim, the landlord's defenses to the breach of contract claim, the tenant's fraudulent inducement claim, and the landlord's breach of contract claim against the tenant. The jury found in favor of the tenant on both of its claims against the landlord but only awarded damages on the breach of contract claim. The jury concluded that the landlord had not proven its breach of contract claim. We have determined that the trial court erred in granting the tenant's motion for partial summary judgment on the breach of contract claim and, therefore, reverse and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and CARMA DENNIS MCGEE, J., joined.

W. Justin Adams, Nashville, Tennessee, for the appellant, Rose Legacy, LLC.

Amy R. Mohan and Mark Alexander Carver, Nashville, Tennessee, for the appellee, GENash, LLC.

# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

In 2017, Agnoletti Properties, LLC ("Landlord") executed a lease with GENash, LLC ("Tenant") for property located on Third Avenue South in downtown Nashville ("the premises"), where Tenant would operate Gino's East Pizza. Prior to opening the restaurant, Tenant completed renovations, including building a large outdoor patio for customer seating. During Tenant's renovations, construction on the Drury Plaza Hotel was in progress next door to the premises. A crane began operating in the airspace above the premises. After the restaurant opened, Tenant reported to Landlord that construction debris was falling onto the outdoor patio. When Tenant contacted Drury about the crane's operations, Tenant learned that, prior to Tenant's signing of the lease, Giancarlo Agnoletti, Landlord's principal, had granted Drury a license to operate a construction crane in the airspace above the premises. By this time, Mr. Agnoletti had died and his adult daughter, Daniela, had taken over his affairs. This lawsuit followed.

Tenant filed this action against Landlord and Drury in December 2020 asserting causes of action for breach of contract and fraudulent inducement. Landlord counterclaimed for breach of contract. In November 2021, Tenant filed a motion for partial summary judgment arguing that, by failing to disclose the license with Drury, Landlord fraudulently induced Tenant to enter the lease and breached the lease by failing to convey to Tenant "the premises to which [Tenant] was entitled." Landlord opposed the motion asserting, in part, that genuine issues of material fact remained as to (1) whether any debris fell from the tower crane, as opposed to falling from the Drury building site, and (2) whether the load end of the crane, as opposed to its boom, ever swung over the premises. Landlord also argued that summary judgment on the breach of lease claim was inappropriate because Tenant's "leasehold did not include airspace rights." In February 2022, the trial court granted in part and denied in part Tenant's motion for partial summary judgment. The court granted Tenant's motion for summary judgment "as to liability"[1] on its breach of lease claim and denied the motion as to the fraudulent inducement claim.

In response to an amended complaint filed by Tenant,[2] Landlord filed an amended counterclaim for breach of contract, property damage, and conversion in June 2023. Tenant dismissed its claims against Drury in August 2023, and the case was tried before a jury in September 2023.

---

[1] In its order, the court reserved "all matters relating to Agnoletti's affirmative defenses." Prior to trial, the court clarified that the summary judgment ruling was limited to a determination that Landlord's actions (in failing to disclose the license) constituted a breach of the lease.

[2] Rose Legacy, successor in interest to Agnoletti Properties, was substituted as plaintiff in May 2022.

The jury found that Tenant was entitled to $287,433 in damages for lost profits from its inability to use the patio due to Drury's crane. The jury further found that Tenant proved its prior breach affirmative defense to Landlord's contract claim; that Landlord failed to prove its affirmative defenses to Tenant's fraud and contract claims; that Tenant proved fraudulent inducement but was not entitled to rescission of the lease; and that Landlord failed to prove its property damage and conversion claims. The trial court subsequently granted Tenant's motion for attorney fees, expenses, and interest. On November 1, 2023, the trial court entered a final judgment awarding total damages (including attorney fees, expenses, and prejudgment interest) in the amount of $725,249.37. The trial court denied Landlord's post-trial motions on February 6, 2024, and Landlord appealed.

In this appeal, Landlord raises the following issues:

1. Whether the trial court erred in granting partial summary judgment, holding that Landlord breached the lease by giving Drury a license to use the airspace above the property, because the court erroneously interpreted the lease to convey airspace rights to Tenant.
2. Alternatively, whether the trial court erred in granting partial summary judgment because there was a genuine issue of material fact as to whether the lease conveyed airspace rights to Tenant.
3. Whether Landlord timely asserted section 9(d) of the lease (excluding liability for business interruption) as a defense to Tenant's contract claim.
4. Whether Landlord is entitled to a directed verdict dismissing Tenant's prior breach defense and a new trial on Landlord's contract claim.
5. Whether Landlord is entitled to a new trial on its contract claim because there was no material evidence to support the jury's verdict accepting Tenant's prior breach defense.
6. Whether Landlord is entitled to a new trial on its contract claim because the trial court did not properly instruct the jury on Tenant's prior breach defense and/or because the trial court unfairly required the jury to decide that defense before Landlord's claim.
7. Whether Landlord is entitled to a new trial on its affirmative defenses of settlement and release, promissory estoppel, and equitable estoppel because the trial court erroneously excluded crucial evidence and/or failed to give a curative instruction in response to Tenant's counsel's misleading statement to the jury about Landlord's counsel's availability as a witness.
8. Whether Landlord is entitled to a new trial on Tenant's contract claim because there was no material evidence to support the jury's damages award.

Tenant raises two additional issues: (1) whether the jury's finding of fraud, which Landlord does not challenge, independently supports the award of damages, and (2) whether this Court should affirm the trial court's award of attorney fees and award Tenant its appellate attorney fees.

ANALYSIS

I.     Summary judgment as to liability on Tenant's breach of contract claim

Landlord's first two issues challenge the trial court's decision granting partial summary judgment to Tenant on its claim for breach of the lease. Deciding a motion for summary judgment is a matter of law, so we review a trial court's ruling de novo without a presumption of correctness. *Bakker v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, No. E2022-00872-COA-R3-CV, 2024 WL 940243, at *3 (Tenn. Ct. App. Mar. 5, 2024). Therefore, we must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." TENN. R. CIV. P. 56.04. "A disputed fact is material if it must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993).

Landlord argues that the lease did not convey airspace rights and, therefore, Landlord did not breach the lease by granting the license to Drury. As it argued before the trial court, Tenant argues on appeal that the lease did convey airspace rights and that the Landlord breached the lease in two ways: by failing to demise and lease all rights in the premises, and by breaching the covenant of quiet enjoyment.

A.  Conveyance of airspace rights

In granting summary judgment as to liability on the breach of contract claim, the trial court found that the lease and license agreement were unambiguous. In its brief order, the trial court also made the following findings:

> c. It is undisputed that the License Agreement allows Drury to use areas of the property covered by the Lease Agreement.
> d.  It is further undisputed that [Tenant] closed its patio due to Drury's activity in areas of the property covered by the Lease Agreement.
> e.  There are thus no questions of fact that [Landlord] breached the Lease Agreement. The only remaining question is in what amount [Tenant] suffered damages as a result of the breach.

From these statements, we discern that the trial court considered the airspace rights to be part of the premises conveyed by the lease.

Tenant's first argument here is that the Landlord breached section 2 of the lease, which required Landlord to "demise[ ] and lease" to Tenant "the property located at 311 3rd Avenue S, Nashville, as more particularly described in Exhibit A," which contains the legal description of the premises. Tenant begins by asserting that "Landlord concedes it owned the air rights above its property, where the crane operated." In support of this assertion, Tenant cites the statement in Landlord's appellate brief that "Landlord could, in theory, have claimed ownership of that airspace by building its own 22-story skyscraper." We reject Tenant's interpretation of this statement as a concession concerning the legal question of whether the lease conveyed airspace rights. Immediately after the quoted statement, Landlord clarified: "Under the Lease, however, Tenant had no theoretical right to build up but was limited to using a one-story building." Landlord's clear position is that "the parties did not intend to grant Tenant airspace rights."

To support its position that the rights owned by Landlord (and, therefore, demised to Tenant under the lease) included the air rights over the patio, Tenant cites *Massey v. R.W. Graf, Inc.*, 277 S.W.3d 902 (Tenn. Ct. App. 2008). *Massey* was a declaratory judgment action concerning the applicability of building restrictions to a non-platted parcel of property. *Id.* at 903. In discussing the construction of restrictive covenants and the rights of property owners, the court quoted the following principles:

> "[E]very proprietor of land, where not restrained by covenant or custom, has the entire dominion of the soil *and the space above and below to any extent he may choose to occupy it*, and in this occupation he may use his land according to his own judgment, without being answerable for the consequences to an adjoining owner, unless by such occupation he either intentionally or for want of reasonable care and diligence inflicts upon him an injury."

*Id.* at 908 (quoting *Humes v. Mayor of Knoxville*, 20 Tenn. (Hum.) 403, 407 (1839)) (emphasis added). The issue in our case is the meaning of the italicized language, and *Massey* does not shed any light on that issue.

Tenant also cites *Osborne Enterprises, Inc. v. City of Chattanooga*, 561 S.W.2d 160 (Tenn. Ct. App. 1977), to support its position. The plaintiffs in *Osborne*, companies involved in land development in Chattanooga, sued the city claiming inverse condemnation. *Id.* at 162. The plaintiffs owned property in the approach zone for one of the runways for the city's airport. *Id.* The city passed ordinances establishing glide angles for the airport's runways, and the plaintiffs sought damages for the city's cutting of trees and the loss of airspace above their property. *Id.* at 162-63. The trial court granted the city's motion for summary judgment based upon the statute of limitations. *Id.* at 163. This Court reversed the trial court's decision to grant summary judgment because there was conflicting evidence as to when the cause of action accrued. *Id.* at 165-66. In reaching this conclusion, the court recognized that "[t]he taking of air space above one's property does

in fact create a cause of action upon which relief may be granted." *Id.* at 164. More specifically, the court quoted our Supreme Court's statement that "'the obtaining of property for public use where the property is either actually appropriated or the common or necessary use of the property is rendered impossible or seriously interrupted constitutes a taking.'" *Id.* (quoting *Johnson v. City of Greeneville*, 435 S.W.2d 476, 480 (Tenn. 1968)).

An important case in this developing area of the law is *United States v. Causby*, 328 U.S. 256, 258 (1946), where the issue presented was whether the government's use of an airport near the plaintiff's home and chicken farm constituted a taking under the Fifth Amendment. Military aircraft were making frequent and regular flights at low altitudes over the plaintiff's property. *Causby*, 328 U.S. at 258-59. Although the Court remanded the matter to the Court of Claims for additional findings, the Court stated that, "The landowner owns at least as much of the space above the ground as [he] can occupy or use in connection with the land." *Id.* at 264. Subsequent cases have relied upon the fundamental principle from *Causby* that "a property owner owns only as much air space above his property as he can practicably use." *Geller v. Brownstone Condo. Ass'n*, 402 N.E.2d 807, 809 (Ill. App. Ct. 1980); *see also Long v. City of Charlotte*, 293 S.E.2d 101, 106-07 (N.C. 1982).

Based upon these cases, we conclude that a property owner owns the airspace over his or her property to the extent that the owner can practicably use the airspace or to the extent that ownership of the airspace is necessary to the regular or intended use of the property. In the present case, the airspace at issue—i.e., the airspace conveyed to Drury by the license—was the airspace used by the construction crane, some twenty stories above the restaurant's patio. We agree that Landlord has a claim for ownership of this airspace because Landlord could choose to build a structure that would use this airspace. It is a separate question, however, as to whether the lease at issue conveyed this airspace to Tenant.

To determine the premises conveyed by the lease, we must look to the relevant terms of the lease, which is a contract subject to the same rules of interpretation applicable to any contract. *Captain D's Realty, LLC v. EP-D, Ltd.*, No. W2012-02142-COA-R3-CV, 2013 WL 1803741, at *5 (Tenn. Ct. App. Apr. 30, 2013). The interpretation of a contract is a question of law that we review de novo with no presumption of correctness. *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013). When interpreting a contract, a court's task "'is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy.'" *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002) (quoting *Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190 (Tenn. 1973) (quoting 17 AM. JUR. 2D, *Contracts*, § 245)). Courts ascertain the parties' intent by considering "'the usual, natural, and ordinary meaning of the contractual language.'" *Id.* at 889-90 (quoting *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). If the contractual language is clear and

unambiguous, "the literal meaning of the language controls," and the determination of the parties' intent "is generally treated as a question of law because the words of the contract are definite and undisputed," leaving no genuine factual issue for a court or jury to decide. *Id.* at 890 (citing 5 Joseph M. Perillo, CORBIN ON CONTRACTS, § 24.30 (rev. ed. 1998); *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)).

Where a contractual provision "is susceptible of more than one reasonable interpretation," however, the contract's terms are ambiguous. *Memphis Hous. Auth. v. Thompson*, 38 S.W.3d 504, 512 (Tenn. 2001). In other words, "'"[a]mbiguity" in a contract is doubt or uncertainty arising from the possibility of the same language being fairly understood in more ways than one.'" *Stonebridge Life Ins. Co. v. Horne*, No. W2012-00515-COA-R3-CV, 2012 WL 5870386, at *4 (Tenn. Ct. App. Nov. 21, 2012) (quoting *NSA DBA Benefit Plan, Inc. v. Conn. Gen. Life Ins. Co.*, 968 S.W.2d 791, 795 (Tenn. Ct. App. 1997)). If a contract's terms are ambiguous, "the intention of the parties cannot be determined by a literal interpretation of the language, and the courts must resort to other rules of construction." *Planters Gin Co.*, 78 S.W.3d at 890. As the Tennessee Supreme Court has explained:

> "When contractual language is found to be ambiguous, the court must apply established rules of construction to determine the intent of the parties. An ambiguous provision in a contract generally will be construed against the party drafting it. Furthermore, when a contractual provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract."

*CHS Dev. Corp., Inc. v. Lakeview Neurorehab Ctr. Midwest, Inc.*, No. E2018-00519-COA-R3-CV, 2018 WL 6707920, at *5 (Tenn. Ct. App. Dec. 19, 2018) (quoting *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611-12 (Tenn. 2006) (internal citations omitted)). "If the contract is ambiguous even after this Court applies the pertinent rules of construction, then the interpretation of the contract 'become[s] a question of fact such that summary judgment is not proper.'" *Stonebridge Life Ins. Co.*, 2012 WL 5870386, at *4 (quoting *Planters Gin Co.*, 78 S.W.3d at 890); *see also Dick Broad. Co.*, 395 S.W.3d at 659.

In this case, the lease provides, in paragraph 2:

The Landlord, for and in consideration of the covenants and agreements hereinafter contained, and subject to the fulfillment of the conditions which are contained in Paragraph 6(a), demises and leases to the Tenant and the Tenant hereby leases and accepts from the Landlord, for the Term and upon the conditions set forth in this Lease, *the property located at 311 3rd Avenue S, Nashville, Tennessee*, as more particularly described on Exhibit A [the legal description of the property], *which is comprised of 3,870 usable square*

*feet of space* ("Premises") (square footage is subject to Architect verification), *plus exclusive use of the parking lot*, as more particularly set forth on Exhibit B which is attached hereto and incorporated herein.

(Emphasis added). Pursuant to paragraph 5,

It is understood that Tenant intends to use the Premises for the operation of a full service restaurant for the purpose of selling foods and other products to the public . . . and a bar where alcoholic beverages . . . [and] other types of beverages are also sold and consumed, and for such other uses as are now or may from time to time be customary or standard for the conduct of such type of restaurant and bar.

Read together, these two key paragraphs indicate that the premises leased to Tenant consists of the square footage of the existing building and the parking lot useable for the operation of a restaurant. We agree with the trial court's conclusion that the lease agreement is not ambiguous. Respectfully, however, we disagree with the trial court's conclusion that "the License Agreement allows Drury to use areas of the property covered by the Lease Agreement."

Tenant argues that the airspace must have been conveyed by Landlord under the lease because, otherwise, Tenant "could not have erected a flagpole or sign on the Premises." We agree that, under the lease, Tenant must have received control over as much of the airspace as necessary to operate its business. We cannot conclude, however, that Tenant received any claim of dominion over the airspace used by the crane. We find no basis to conclude, under the undisputed facts of this case, that the lease conveyed airspace rights to Tenant regarding the airspace in which the crane operated.

We, therefore, conclude that the trial court erred in granting summary judgment in favor of Tenant on its claim of breach of the lease based upon conveyance of the pertinent airspace rights to Tenant.

B. Covenant of quiet enjoyment

Tenant next argues that it was also entitled to summary judgment on its breach of contract claim under the theory of breach of the lease's covenant of quiet enjoyment.

Under Tennessee caselaw, an ordinary lease includes "an implied covenant that the lessee will have the quiet and peaceable possession and enjoyment of the leased premises." *Morrison v. Smith*, 757 S.W.2d 678, 682 (Tenn. Ct. App. 1988). In this case, Section 6(a) of the lease includes an express covenant of quiet enjoyment:

Landlord covenants, represents and warrants it has the full right and power to execute and perform this Lease and to grant the estate demised herein, and that Tenant, upon payment of the rent and performance of the covenants and agreements hereof, shall peaceably and quietly have, hold and enjoy the Premises and all rights granted herein during the Term.

A covenant of quiet enjoyment "'protects the lessee from any act of the lessor which destroys the quiet and beneficial enjoyment of the use of the property.'" *Hixson v. Am. Towers, LLC*, 593 S.W.3d 699, 712 (Tenn. Ct. App. 2019) (quoting *Couch v. Hall*, 412 S.W.2d 635, 637 (Tenn. 1967)); *see also Morrison*, 757 S.W.2d at 683 (quoting *W.E. Stephens Mfg. Co. v. Buntin*, 181 S.W.2d 634, 636 (Tenn. Ct. App. 1944)). The covenant is breached when "'the landlord obstructs, interferes with, or takes away from the tenant in a substantial degree the beneficial use of the leasehold.'" *Hixson*, 593 S.W.3d at 712-13 (quoting 49 AM. JUR. 2D *Landlord and Tenant* § 473).

Landlord's argument on this issue is that a breach of the covenant of quiet enjoyment could have occurred only if the lease had conveyed the airspace used by the tower crane. We respectfully disagree. Landlord has cited no caselaw to support this position. At least one Tennessee case is consistent with the opposite view. In *Moe v. Sprankle*, 221 S.W.2d 712, 713-14 (Tenn. Ct. App. 1948), the landlord leased part of a building to the complainant to use as a bookstore. The complainant sued the landlord for trespass and breach of a covenant of the lease for quiet enjoyment of the premises, alleging that defective plumbing in apartments over the leased premises, which were leased by the same landlord, caused water damage to the bookstore. *Id.* The trial court ruled in favor of the complainant and awarded damages, and the appellate court affirmed.[3] *Id.* at 716. Thus, the appellate court upheld a claim for breach of the covenant of quiet enjoyment based upon the landlord's conduct in a nearby apartment unit, which was not part of the property conveyed to the complainant.

Beyond our state, the scope of the covenant of quiet enjoyment as to off-premises conduct can be summarized as follows:

[T]he covenant of quiet enjoyment also makes landlords responsible for certain conditions outside the premises that would substantially interfere with tenants' beneficial possession or enjoyment of leased premises but do not constitute an actual eviction. For example, excessive construction work by the landlord's agents on or around the leased premises could violate the covenant if the tenant is no longer able to conduct business amidst the distraction and interference.

---

[3] The main issue on appeal was whether eviction of the tenant from the premises was a condition precedent to the claim for breach of the covenant for quiet enjoyment, and the appellate court agreed with the trial court's refusal to dismiss the suit on that ground. *Id.* at 716.

Eugene L. Grant, *Disturbing Concepts: Quiet Enjoyment and Constructive Eviction in the Modern Commercial Lease*, 35 REAL PROP. PROB. & TR. J. 57, 62 (Spring 2000); *see also* Kathleen E. Okon, *Poodle Pandemonium: Emotional Support Animals and the Covenant of Quiet Enjoyment*, 2021 U. ILL. L. REV. 659, 665 (2021).

In a recent case involving a commercial lease with some factual similarity to the present case, an appellate court in Massachusetts reversed the trial court's grant of summary judgment in favor of the landlord on a tenant's claim for breach of the covenant of quiet enjoyment. *Classic Rest. Concepts, LLC v. Pres. & Fellows of Harvard Coll.*, 238 N.E.3d 777, 782 (Mass. App. Ct. 2024). The landlord rented property on Holyoke Street in Harvard Square to the tenant for the purposes of operating a restaurant, and the lease included an express covenant of quiet enjoyment. *Id.* at 782-83. The landlord owned property across the street from the restaurant and had hired a contractor to undertake a building project on that property. *Id.* In conjunction with the building project, the contractor received permission from the town to close Holyoke Street to vehicular traffic during construction hours. *Id.* at 783. Evidence was presented to the court that "the final decision on a construction 'means and methods' issue such as a street closure would be up to the client," the landlord. *Id.* The tenant opened the restaurant in the fall of 2016 but, according to one of its principals, the construction made the street "a war zone" and "it was hard to get to the restaurant." *Id.* The restaurant only paid rent for two months and "ceased operations as of June 2017." *Id.* The appellate court determined that disputed issues of fact remained as to the restaurant's claim for breach of the covenant of quiet enjoyment. *Id.* at 788. In so holding, the court noted, "that the street closure did not render the premises entirely inaccessible would not preclude a finding that the closure nevertheless seriously interfered with Classic's [the restaurant's] tenancy, or deprived Classic of the reasonable access that Harvard [the landlord] knew Classic needed in order to operate a high-end restaurant while maximizing revenue." *Id.* (citation omitted).

Despite the foregoing discussion, this Court cannot affirm the trial court's summary judgment on this ground because the determination as to whether Landlord's conduct substantially interfered with Tenant's quiet and beneficial use of the property is a question of fact. *See Couch*, 412 S.W.2d at 638. There is no dispute that Landlord entered into a license agreement with Drury to operate a crane in the airspace above the restaurant and did not inform Tenant. However, at the summary judgment stage, Landlord disputed whether anything fell from the tower crane onto the property and whether the tower crane ever carried a load over the property. Landlord argued that any interference with Tenant's enjoyment of the patio could have been caused by construction debris from the Drury property (over which Landlord had no control) rather than by items falling from the crane in the relevant airspace. We conclude that genuine issues of material fact remained and that the trial court's grant of summary judgment to Tenant on the breach of contract claim cannot be upheld under this theory.

Given our conclusion that the trial court erred in granting summary judgment as to liability on Tenant's breach of contract claim, we consider most of the remaining issues on appeal to be pretermitted. We must, however, address one remaining issue raised by Tenant on appeal: that the jury's finding of fraud provides an independent ground to support the trial court's award of damages.

II.     Fraudulent inducement

Tenant asserts that "[t]he jury's award of $287,433 in lost profits is independently supported by its finding—by clear and convincing evidence—that Landlord fraudulently induced [Landlord] to enter the lease by concealing the license." Unfortunately, for the reasons set out below, this Court cannot substitute these breach of contract damages as damages for the fraudulent inducement claim.

As Tenant emphasizes, Landlord did not raise an issue on appeal to challenge the jury's verdict and resulting judgment ruling in Tenant's favor on the claim for fraudulent inducement.[4] Tenant asserts that "[t]he damages from Landlord's fraudulent concealment are the same as the damages for Landlord's breach of contract—the lost profits caused by the license." Tenant argues that, after the verdict, it elected to recover the $287,000 in damages as its remedy for both the breach of contract and fraudulent inducement claims.

Before discussing Tenant's reasoning, we will review the pertinent procedural history. In its complaint and at trial, Tenant asserted that Landlord breached the lease (a contract claim) and that Landlord fraudulently induced Tenant to enter into the lease (a tort claim). Consistent with Tenant's requests, the jury instructions regarding its breach of contract claim stated: "The proper measure of damages is lost profits—the amount of profits GENash allegedly lost due to Agnoletti Properties' breach of the lease." Also consistent with Tenant's requests, the jury instructions for its fraudulent inducement claim stated that Tenant sought to rescind the lease. The jury was further instructed:

> If you find rescission appropriate, you may award GENash rescission damages—the amount of money necessary to restore GENash to its position before entering the Lease, or the amount GENash would not have expended it [sic] had it known about the License before signing the Lease.

The jury verdict form gave the jury the following pertinent question regarding Tenant's breach of lease claim:

> 1. As the Chancellor informed you, the Court has already ruled that Agnoletti Properties breached the lease as a result of the License Agreement

---

[4] In its reply brief, Landlord does argue that, "If this Court holds the jury's fraud finding is an independent ground for its lost profits award, that finding should be reversed."

- 11 -

that allowed the Drury hotel to use areas of the property covered by the lease. What amount of damages, if any, has GENash proven by a preponderance of the evidence as a result of this breach of the lease?

In response to question 1, the jury answered $287,433, which is the amount of lost profits to which Tenant's expert testified. On the fraudulent inducement claim, the jury verdict form gave the jury the following pertinent questions:

> 7. Has GENash proven by clear and convincing evidence all of the elements of fraudulent inducement?

> 8. If you answered "No" to Question 7, then go to Question 14 and skip Questions 8 through 13. If you answered "Yes" to Question 7, do you find that GENash is entitled to rescission of the lease based on fraudulent inducement.

The jury answered question 7 "Yes" and question 8 "No."

In Tenant's closing arguments, Tenant's attorney reminded the jury that "the proper measure of damages for a breach of the lease is lost profits." On the fraudulent concealment claim, Tenant's attorney told the jury:

> So what about the damages? Chancellor Perkins has instructed you that rescission is an appropriate measure of damages when a party has been induced to enter a contract by fraud. . . . And what is rescission? It's just a fancy word for undoing a contract. It returns the parties to the positions they were in before the transaction took place, when one party would not have entered into the transaction if it had known all of the facts. So where was [Tenant] in 2016 before it entered into the lease? . . . And so at the bottom [of Tenant's summary of costs], you see the number that [Tenant] would not have expended, had [Tenant] known about that license. About $1.7 million.

Thus, in the jury instructions, in closing arguments, and on the verdict form, the jury was asked to consider awarding lost profits for the breach of contract claim and rescission (or rescission damages) for the fraudulent inducement claim. After deliberating, the jury entered a verdict on September 22, 2023, in which it awarded lost profits on the breach of contract claim (for which liability had been determined on summary judgment) and declined to award the only relief requested by Tenant for the fraudulent inducement claim, namely rescission.

On September 28, 2023, the trial court entered an order on the jury verdict and entered judgment in favor of Tenant on both claims against Landlord, ordering Landlord to pay $287,433 in damages. As specified in the order, the issue of attorney fees remained

- 12 -

outstanding and, thus, there was not yet a final judgment. Tenant filed its motion for attorney fees, expenses, and prejudgment interest on October 9, 2023. In an order entered on November 1, 2023, the court ruled on Tenant's motion for attorney fees and decreed that this order, along with the court's previous order on the jury verdict, constituted the final judgment.

After entry of the judgment, Landlord filed several post-trial motions requesting relief from the judgment. On February 5, 2024, the trial court entered an order denying all of the motions.

As outlined in this procedural summary, Tenant requested only rescission on its claim for fraudulent inducement. While finding in Tenant's favor on both causes of action, the jury declined to award rescission of the lease. The trial court entered judgment on the jury verdict. Tenant did not file any post-trial or post-judgment motions asking the court to reject any part of the jury verdict. We know of no authority that would allow this Court to alter the jury verdict to make the breach of contract damages applicable to the fraudulent inducement claim.

Citing authorities on the election of remedies, Tenant asserts that, after the verdict, it simply elected to apply the damages award to both of its causes of action. Under the election of remedies doctrine, "'a plaintiff may be forced to elect between different remedies where the remedies are so inconsistent or repugnant that pursuit of one necessarily involves negation of the other.'" *Miller v. United Automax*, 166 S.W.3d 692, 696 (Tenn. 2005) (quoting *Forbes v. Wilson Cnty. Emerg. Dist. 911 Bd.*, 966 S.W.2d 417, 421) (Tenn. 1998) (internal citations omitted)). This Court has previously stated that "a party who has been fraudulently induced into entering into a contract has the option of treating the contract as void and rescinding it or going forward with the contract under the terms as they were represented by the defrauding party." *Davis v. Conner*, No. M2008-00661-COA-R3-CV, 2009 WL 3415284, at *8 (Tenn. Ct. App. Oct. 22, 2009). Thus, the person induced to enter a contract by fraud "'may treat the contract as voidable and sue for the equitable remedy of rescission or he may treat the contract as existing and sue for damages at law.'" *Id.* (quoting *Frizzell Constr. Co. v. Gatlinburg, LLC*, No. 03A01-9805-CH-00161, 1998 WL 761840, at *3 (Tenn. Ct. App. Nov. 2, 1998), *affirmed and remanded*, 9 S.W.3d 79 (Tenn. 1999)). Thus, had the jury in this case awarded Tenant rescission on the fraudulent inducement claim and lost profits on the breach of contract claim, Tenant would have been required by the election of remedies to choose between the two remedies. Here, there was no election to be made because the jury awarded no remedy on the fraudulent inducement claim.

For the foregoing reasons, we reject Tenant's argument that the judgment for fraudulent inducement can support the jury's award of lost profits on the contract claim.

CONCLUSION

The judgment of the trial court is reversed and the matter is remanded for further proceedings consistent with this opinion. Costs of this appeal are assessed against the appellee, GENash, LLC, for which execution may issue if necessary.


/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE